Patrick L. Rocco (PR-8621)
STONE BONNER & ROCCO LLP
447 Springfield Avenue, 2nd Floor
Summit, New Jersey 07901
(908) 516-2045
Email: procco@lawsbr.com

DIETRICH SIBEN THORPE LLP
9595 Wilshire Blvd., Suite 900
Beverly Hills, CA 90212
Telephone: (310) 300-8450
Facsimile: (310) 300-8401

-    and  -

500 Australian Avenue South, Suite 637
West Palm Beach, FL 33401
Telephone: (561) 820-4882
Facsimile: (561) 820-4883

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| OKUMUS OPPORTUNISTIC VALUE FUND, LTD., | Civil Action No. |
| Plaintiff, | |
| vs. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND STATE LAW** |
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, ROBERT ROSIELLO, ARI KELLEN and TANYA CARRO, | |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

Page

I.    SUMMARY OF THE ACTION ................................................................. 1

II.   JURISDICTION AND VENUE ................................................................ 6

III.  THE PARTIES ........................................................................................ 7

    A.    Plaintiff Okumus ........................................................................ 7

    B.    Defendant Valeant ...................................................................... 8

    C.    The Individual Defendants .......................................................... 8

    D.    Non-Party Philidor .................................................................... 10

IV.   FACTUAL BACKGROUND OF DEFENDANTS' WRONGFUL CONDUCT ... 10

    A.    Valeant's Business and Acquisitions ......................................... 10

    B.    Valeant's Improper Use of Patient Assistant Programs ............ 12

    C.    Valeant's Undisclosed Use of the Philidor Network to Protect Its Branded Drugs, Deceive Payors and Book Fictitious Sales ................................... 14

    D.    The R&O Lawsuit ...................................................................... 23

    E.    Defendants' Scheme Is Revealed Through a Series of Partial Disclosures, Causing Valeant's Stock Price to Decline as Defendants Continue to Mislead Plaintiff .................................. 27

V.    SCIENTER ALLEGATIONS .................................................................. 45

    A.    Defendants Influenced and Oversaw Valeant's Business Strategy .......... 45

    B.    Defendants' Use of the Covert Philidor Network .................................... 48

    C.    Valeant's Refusal to Pursue Remedies Against Wrongdoers.................... 52

    D.    Valeant's Admissions of Material Weaknesses in Internal Controls and Financial Reporting ............................................. 52

    E.    Defendants' Admissions During the Congressional Hearings ................. 53

    F.    Executive Departures ................................................................ 55

    G.    Valeant's Unusual Executive Compensation Structure ........................... 57

**Page**

      H.      Defendants Inflate Valeant's Stock Price to Facilitate Acquisitions ........ 60

VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ......................... 60

VII.   VALEANT'S FINANCIAL STATEMENTS VIOLATED GAAP AND SEC RULES ........................................................................................................ 88

VIII.  RELIANCE ..................................................................................................... 95

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........................ 101

X.     CAUSES OF ACTION .................................................................................... 102

XI.    PRAYER FOR RELIEF ................................................................................... 111

XII.   JURY TRIAL DEMAND.................................................................................. 112

Plaintiff Okumus Opportunistic Value Fund, Ltd. ("Okumus" or "Plaintiff") makes the following allegations based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based on, among other things, the independent investigation of its undersigned counsel including, but not limited to, a review and analysis of Valeant Pharmaceuticals International, Inc.'s ("Valeant" or the "Company") filings with the United States Securities and Exchange Commission (the "SEC"); media and securities analysts' reports about the Company; analyst conference calls; presentations Valeant made to investors; internal documents and agreements by and between Valeant, Philidor Rx Services, LLC ("Philidor") and R&O Pharmacy ("R&O"); Congressional hearings, including testimony, interrogatory responses and documents provided by Valeant, and its officers and/or directors; court filings from *In re Valeant Pharmaceuticals Int'l, Inc. Sec. Litig.,* No. 3:15-cv-07658-MAS-LHG (D.N.J.) (the "Class Action") and related actions; statements from former Valeant and/or Philidor employees and other individuals with knowledge of the facts alleged; consultations with experts; and, a review of other matters of public record. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Plaintiff believes that additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

## I.    SUMMARY OF THE ACTION

1.    Defendants fraudulently and/or negligently refused to properly disclose to investors that the Company (1) was achieving growth through unsustainable price increases

for its products with undisclosed attendant risks and (2) in an effort to charge ever increasing prices for its pharmaceutical goods, employed a secret network of pharmacies to deceive and mislead third party payors ("TPP") and pharmacy benefits managers ("PBM"). While pumping up profits in the short run, Valeant's approach posed tremendous undisclosed risks if discovered. Defendants' scheme subjected Valeant to a backlash from, among others, regulators, the doctors who prescribed Valeant products, the PBMs who approved the products, and the TPPs who actually paid Valeant. Plaintiff wrote Valeant puts, and bought Valeant shares, in and after October 2015, and did so unaware of Defendants' highly risky strategy. When the extent of Valeant's reliance on price increases and Valeant's relationship with its secret network of pharmacies, and the nature of that relationship, were exposed, Valeant's business and stock price dropped significantly thereby causing Plaintiff to be damaged.

2.      Valeant is a pharmaceutical and medical device company. Rather than develop its own drugs through research, which Valeant's Chief Executive Officer ("CEO") Michael Pearson ("Pearson") deemed to be inefficient, Valeant sought to acquire drugs from other pharmaceutical companies, and then drive earnings by increasing the price and sales volume for the acquired drugs. Executing on Pearson's strategy, Valeant completed more than 100 acquisitions since 2008.

3.      By 2014 and into mid-2015, Defendants' strategy appeared to be working. Defendants claimed their growth-by-acquisition business model was more profitable and less risky than the approach of traditional pharmaceutical companies that spent heavily on research and development. Valeant's stock price reflected this purported good news, growing from $117 on January 1, 2014 to over $260 by August 2015.

4.      During this time, Defendants repeatedly reassured investors that Valeant's business model was sound. Defendants claimed they drove earnings through marketing and efficiencies. When Valeant's business model was challenged as overly reliant upon unwarranted price increases, Defendants reassured investors that Valeant's financial results were based more on sales growth, not increased pricing. Further, Pearson misleadingly claimed: "I can assure you our operating model is both durable and sustainable."

5.      What Defendants did not tell investors, however, was that Valeant was taking massive, undisclosed risks to drive up its prices, and these risks jeopardized the Company's entire business.

6.      Valeant employed a secret network of captured pharmacies to get around the precautions and roadblocks developed by TPPs and PBMs to monitor and limit the costs of drugs. Independent pharmacies serve as a check on unwarranted price increases by substituting cheaper products that would serve equally as well as a high-priced prescription. To get around these measures, Valeant routed prescriptions away from independent pharmacies into Valeant's secret network of captive pharmacies that had been incentivized by Valeant to sell only Valeant's high-priced products. For example, Valeant sold a product called Onexton for acne, which is a combination of clindamycin phosphate and benzoyl peroxide. Both are available as generics at low cost. Valeant sold the combination for $478 per tube. A legitimate, independent pharmacy would suggest buying the generics and not the expensive Onexton. On the other hand, Valeant's captive secret pharmacy network would only sell Onexton – and the price would be largely borne by the patient's insurance company.

7.     Philidor was the primary pharmacy in Valeant's secret network, and was formed with the assistance of Valeant employees who used aliases to conceal their involvement at Philidor. Valeant concealed its relationship with Philidor (and vice versa) to create the false impression that Philidor and its entire network of pharmacies were independent, reducing the likelihood that payors or pharmacy benefit managers would refuse to reimburse the high priced drugs or unnecessary refills.

8.     Concealing its relationship with (and avoiding scrutiny of) Philidor was particularly important because Philidor engaged in additional deceptive practices to wrongfully obtain payment for Valeant's drugs, such as (i) altering physician prescriptions to require Valeant products (*e.g.*, writing "dispense as written" on the prescription), (ii) resubmitting rejected claims using false information (such as the name of the pharmacy that filled the prescription), and (iii) waiving patient co-pays to incentivize patients to buy Valeant medicines rather than cheaper alternatives.

9.     Valeant made sure that Philidor, and Valeant employees working at Philidor, were incentivized to sell Valeant products (which Philidor did exclusively). For example, in a contract dated December 2014, Valeant agreed to provide Philidor a $25 million bonus for achieving net sales of approximately $524 million in any four consecutive calendar quarters. Valeant would provide Philidor with three additional $25 million payments for hitting increasing sales targets.

10.     Defendants continued to conceal Valeant's relationship with Philidor even after Valeant bought the rights to acquire Philidor. In December 2014, Valeant paid Philidor $100 million for the option to acquire Philidor in the future at no additional cost. Notably, by acquiring an option to buy for zero dollars (but not actually buying Philidor),

- 4 -

Defendants were able to maintain control over Philidor, but also perpetuate the ruse on third party payers that Philidor was an independent pharmacy unaffiliated with Valeant.

11. In 2015, even as Valeant became heavily scrutinized by Congressional investigators and journalists for its price increases, Defendants continued to conceal the existence, risks and deceptive business practices of the Company's secret pharmacy network that helped make Valeant's price increases and volume growth possible.

12. The Philidor scheme drove massive business and price increases for Valeant. Philidor also jeopardized Valeant's entire business. Obtaining approval for Valeant drugs from PBMs, and prompt and fair payment from TPPs, was vital to Valeant's ability to do business. If TPPs and PBMs discovered Valeant was acting deceptively, Valeant's vital relationships were likely to be irreparably damaged. Contracts with PBMs made clear that deceptive acts would endanger continued business.

13. Plaintiff sold Valeant puts and purchased Valeant shares not knowing the extent of Valeant's reliance on price increases for growth nor of Defendants' scheme to utilize Philidor to drive price increases and volume growth. Plaintiff was misled regarding the existence of, and dramatic impacts, such practices would likely have on Valeant's business if and when discovered.

14. By late October 2015, investors – as well as TPPs and PBMs – began to learn the truth through a series of disclosures by the Company, as well as reports by analysts, investigations by government agencies, and private litigation.

15. The impact was severe. The three largest PBMs in the U.S. dropped Philidor from their networks and declared Philidor violated the terms of their agreements.

Recognizing Philidor could not help Valeant dupe payors any longer, and that Philidor was a tremendous risk to Valeant, Valeant likewise terminated its relationship with Philidor.

16.     As the truth was coming to light, Valeant's senior executives were forced from the Company.

17.     After Plaintiff had written puts and bought Valeant stock, Valeant withdrew its financial statements and acknowledged them to be false, restated its revenue for fiscal year 2014, drastically reduced its revenue and profitability guidance for 2015 and 2016, and admitted that the Company's disclosure controls and internal controls over financial reporting had been inadequate.

18.     Disclosures of Defendants' misconduct and its impact on Valeant's business resulted in Valeant's stock price falling from $262 per share in August 2015 to $12.41 at close on March 6, 2017 – the stock presently trades at just under $15 per share – a decline of more than 95%. Plaintiff has been damaged as a result and brings this action to recover damages due to Defendants' misconduct.

19.     Plaintiff asserts claims against Defendants, as detailed herein, for violations of §§10(b), 18 and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), as well as for common law fraud and negligent misrepresentation.

## II.     JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §§1331, 1337, and 1367.

21.     The Court has personal jurisdiction over Defendants, as all Defendants are residents of the United States and/or have minimum contacts with this District.

22.     Venue is proper in this District pursuant to §27 of the Securities Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391(b), (c), and (d).

23.     Defendants transact business in this District. Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District.

24.     In connection with the acts and omissions alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the national securities markets.

## III.     THE PARTIES

### A.     Plaintiff Okumus

25.     Plaintiff Okumus Opportunistic Value Fund, Ltd. is a private British Virgin Islands investment fund managed by non-party Okumus Fund Management, Ltd. Plaintiff maintains its principal office in Road Town, Tortola, British Virgin Islands.

26.     Non-party Okumus Fund Management, Ltd. ("Okumus Fund Management") is a registered institutional investment manager, managing private investment funds exclusively for qualified investors. Okumus Fund Management is the investment manager on behalf of Plaintiff Okumus Opportunistic Value Fund, Ltd. and maintains its principal office in New York, New York. Okumus Fund Management had total investment discretion for Plaintiff's investments.

27.     Plaintiff and Okumus Fund Management, as the investment manager for Plaintiff, read and relied upon the Defendants' false and misleading statements alleged herein and as set forth in greater detail below. In reliance on the Defendants' material

- 7 -

misrepresentations and omissions, Plaintiff acquired Valeant securities and suffered substantial losses caused by the Defendants' wrongful conduct.

28.     Plaintiff purchased approximately 4.6 million Valeant shares, and sold put options, in and after October 2015 at artificially inflated prices. Plaintiff held substantial Valeant shares through March 2016 when the disclosures of the truth concerning Defendants' fraudulent scheme primarily occurred. Plaintiff's purchases and sales of Valeant Securities are set forth in Plaintiff's trade data provided to Defendants by letter dated August 14, 2017. Plaintiff's trade data is incorporated by reference herein, which Plaintiff will submit to the Court under seal upon request.

### B.     Defendant Valeant

29.     Defendant Valeant is a specialty pharmaceutical and medical device company that develops, manufactures, and markets a range of branded and generic pharmaceuticals, over-the-counter products, and medical devices. Valeant is incorporated in British Columbia, Canada and operates its U.S. headquarters in this District, which are located at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey. Shares of Valeant stock trade on the New York Stock Exchange ("NYSE") under the ticker symbol "VRX."

### C.     The Individual Defendants

30.     Defendant J. Michael Pearson was Valeant's CEO and a director of the Company from 2008 to May 3, 2016, as well as Chairman of the Board of Directors from March 2011 to January 2016. Pearson left Valeant on medical leave in January and February of 2016, and the Company announced he would be replaced in March 2016.

31.     Defendant Howard B. Schiller ("Schiller") was Valeant's Chief Financial Officer ("CFO") and an Executive Vice President of the Company from December 2011

until June 30, 2015, when he resigned. Schiller served as a director of the Company from September 2012 until June 2016, and interim CEO in January and February 2016 when Defendant Pearson was on medical leave. On March 21, 2016, Valeant announced that Schiller had engaged in "improper conduct" related to the Company's financial restatement, and requested he resign as a director.

32.     Defendant Robert L. Rosiello ("Rosiello") was Valeant's CFO and an Executive Vice President of the Company between July 2015 and December 31, 2016. While Defendant Pearson was on medical leave, but before Defendant Schiller became interim CEO, Rosiello served as one of three members of Valeant's "Office of the CEO."

33.     Defendant Dr. Ari S. Kellen ("Kellen") was Valeant's Executive Vice President and Company Group Chairperson between January 2014 to December 31, 2016. Defendant Kellen also served as one of the members of the Office of the CEO in 2016.

34.     Defendant Tanya Carro ("Carro") was Valeant's Corporate Controller. On March 21, 2016, Valeant announced that Carro had been placed on administrative leave after committing "improper conduct" related to the Company's financial restatement, and subsequently replaced Carro.

35.     Defendants Pearson, Schiller, Rosiello, Kellen, and Carro are referred to herein as the Individual Defendants.

36.     During the relevant period, the Individual Defendants, as senior executive officers of Valeant, were privy to confidential, proprietary, and material adverse non-public information, concerning Valeant, its operations, finances, financial condition, and present and future business prospects. Given their positions at Valeant, the Individual Defendants had access to non-public information about Valeant's business, finances, products,

markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them. Given their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts alleged here had been misrepresented and/or had not been disclosed to, and were being concealed from, the investing public.

### D. Non-Party Philidor

37. Non-party Philidor was a specialty pharmacy formed in part by Valeant employees in 2013, and registered as a Delaware limited liability company. Philidor's headquarters were in Pennsylvania, and it operated at the center of a covert network of specialty pharmacies with Valeant as its only client of substance. The related entities included among others, KGA, a wholly owned Valeant subsidiary that paid $100 million for the option to acquire Philidor in October 2014; Isolani, LLC ("Isolani"), a Delaware limited liability company that Philidor used to acquire a California Pharmacy license, with its sole member listed as Philidor's Senior Director of Call Center Operations; and Back Rank, LLC, which used Philidor's address in Pennsylvania as its address, and listed Philidor's Controller as its president. On November 25, 2015, Philidor effectively closed.

## IV. FACTUAL BACKGROUND OF DEFENDANTS' WRONGFUL CONDUCT

### A. Valeant's Business and Acquisitions

38. Unlike other traditional pharmaceutical companies that spent significant portions of their budgets on research and development, during the relevant period Valeant focused on acquiring drug companies with already established pharmaceutical products,

cutting research and development costs, and raising prices while using covert pharmacy practices to exploit flaws in the healthcare system. For example, when asked about cancer research, Defendant Pearson responded: "I think it's a losing proposition. I don't know any pharmaceutical company who has generated positive returns on it."

39.     Valeant completed more than 100 acquisitions since 2008 for a total of more than $30 billion. Notably, on December 11, 2012, Valeant acquired Medicis Pharmaceutical Corporation ("Medicis") for $2.6 billion; on August 5, 2013, Valeant acquired Bausch & Lomb Holdings Incorporated ("Bausch & Lomb") for $8.7 billion; on February 10, 2015, Valeant acquired certain drugs from Marathon Pharmaceuticals ("Marathon") for $350 million; on April 1, 2015, Valeant acquired Salix Pharmaceuticals, Ltd. ("Salix") for $14.5 billion; and on October 1, 2015, Valeant acquired Sprout Pharmaceuticals, Inc. ("Sprout") for approximately $1 billion.

40.     Several of the drugs acquired by Valeant were considered "orphan drugs," which treat rare medical conditions. Due to the small populations that these drugs service, orphan drugs face little to no competition, despite being past the point of protection from generics. As a result, Valeant saw such drugs as an opportunity to boost revenue by increasing prices.

41.     During the relevant period, Valeant attributed the success of its non-traditional strategy to its aggressive cost-cutting strategies, its "outstanding sales teams, implementation of innovative marketing approaches, great leadership, [and] a portfolio of great products." Similarly, in a February 22, 2015 Valeant press release, Pearson attributed Valeant's growth to the Company's "output-focused research and development model," which involved "focusing on innovation through our internal research and development,

acquisitions, and in-licensing" and "focusing on productivity through measures such as leveraging industry overcapacity and outsourcing commodity services."

42.     Unbeknownst to investors such as Plaintiff, Valeant's growth was driven by its use of a secret network of captive pharmacies and other deceptive business practices. Valeant's use of a clandestine pharmacy network enabled the Company to drive volume growth and increase the prices of its branded drugs, by circumnavigating safeguards created by TPPs, PBMs and others.

**B.     Valeant's Improper Use of Patient Assistant Programs**

43.     Patient Assistance Programs ("PAPs") are intended to ensure that financially needy persons are not deprived of medications. Valeant increased its PAPs during the relevant period in order to waive or substantially reduce patient copays without full disclosure to payors.

44.     The undisclosed waiver of copays led patients to obtain higher priced Valeant drugs rather than lower priced generic substitutes, and to obtain unnecessary refills, whose costs were reimbursed by the insurance companies and other TPPs. Had Valeant charged copays, patients (and doctors) would have been incentivized to choose lower cost drugs and to avoid unnecessary prescriptions, thereby reducing unneeded costs that were ultimately born by the insurance companies and other TPPs. Further, had Defendants properly disclosed their routine waiver of patient copays, PBMs and TPPs would not have paid the prices they did for the relevant Valeant-branded drugs, or paid for them at all.

45.     Valeant's total spend on PAPs increased by over 1,100% from 2012 to 2015, from $53 million to $600 million, respectively, with expectations for PAPs spending

- 12 -

to reach over $1 billion in 2016. In comparison, the Company's revenues increased by only 300%, in the same time period, from $3.5 billion in 2012 to $10.4 billion in 2015.

46.     Given the federal anti-kickback laws prohibiting such practices involving government payors, Valeant targeted its PAP practices toward patients with private insurance. However, engaging in such activities left Valeant open to potential violations of state fraud and deceptive practice statutes and contract terms. It also increased the risk that private insurers would apply extra scrutiny to Valeant or refuse to reimburse Valeant prescriptions.

47.     Mark Merritt ("Merritt"), President and CEO at the Pharmaceutical Care Management Association ("PCMA"), which represents PBMs, explained to Congress at a hearing on Valeant that PBMs "encourage the use of generics and more affordable brand medications." He noted that PBMs restrain drug costs by "using differential copays and other tools to encourage patients to choose more affordable options." Merritt explained that the pricing and marketing tactics by Valeant were designed to reduce "resistance to higher prices." He testified that by providing copay coupons to encourage patients to bypass generic and cheaper drugs "for higher cost branded drugs," Valeant forced "the employer's unions and others to pay hundreds of thousands more for the most expensive brands on the formulary." Merritt noted "such practices are considered illegal kickbacks in federal programs."

48.     For example, an internal Valeant presentation detailed the proposed launch of a new PAP called "Valeant Coverage Plus Program." The presentation plainly stated that "[t]he program will be funded through planned price increases [i.e. funded by higher prices to payors rather than by Valeant]." The analysis directed adjudicators to "[u]tilize

all of patient resources prior to co-pay mitigation or foundation assistance" when adjudicating claims and to use a "[p]atient assistance program or free goods as last resort." The presentation noted that Valeant had an opportunity to expand utilization "for niche brands" that "[i]nvolves a combination of alternative/restricted distribution model, advocacy support and patient assistance programs" along with "planned pricing actions expected to maximize overall returns."

### C. Valeant's Undisclosed Use of the Philidor Network to Protect Its Branded Drugs, Deceive Payors and Book Fictitious Sales

49. In order to insulate its brand name drugs from competition and boost sales, Valeant embarked on a scheme to funnel sales of its branded drugs through a nationwide network of captive pharmacies. Through this secret network, Valeant insulated its products from competition by, among other things, flouting statutory or contractual mandates requiring substitution of generic equivalents for Valeant-branded drugs and submitting false claims information to TPPs and PBMs. This scheme enabled Valeant to massively increase the price of its drugs and inflate the number of claims paid on prescriptions for those drugs. As a result, TPPs and PBMs overpaid for Valeant's expensive branded drugs, were prevented from obtaining cheaper generic alternatives, and paid for drugs that should never have been dispensed, inflating Valeant's stock price.

50. At the center of this network of captive pharmacies was Philidor. On January 2, 2013, Philidor was incorporated as a purportedly independent specialty mail order pharmacy. Philidor was licensed in 45 states and the District of Columbia.

51. Philidor falsely held itself out to be a "specialty pharmacy." However, true specialty pharmacies focus on self-administered specialty drugs covered under a patient's pharmacy insurance benefit. Such specialty drugs are almost always highly differentiated

brand-name drugs for patients undergoing intensive therapies for chronic, complex illnesses. Often, such drugs come in the form of self-administered injections or require constant refrigeration. Philidor, on the other hand, was principally devoted to dispensing Valeant's undifferentiated traditional drugs — principally its dermatological products — many of which had low-cost generic substitutes. Philidor has admitted Valeant was Philidor's "only client."

52.     Valeant employees worked with Philidor's founders to set up the pharmacy in 2013. One month before Philidor was incorporated, Valeant hired manager Gary Tanner ("Tanner") to act as the drug company's special "liaison" with Philidor and help ramp up the pharmacy's operations. Likewise, on the same day Philidor was incorporated, Valeant hired Laizer Kornwasser ("Kornwasser") – a former senior executive at Medco – to oversee Valeant's relationship with Philidor. Kornwasser, who supervised Tanner, reported directly to Valeant CEO Pearson. Immediately upon being hired, Kornwasser received nearly $5 million in Valeant equity awards. Both Kornwasser's prominence in Valeant's organizational structure and his outsized compensation demonstrate that Valeant viewed its relationship with Philidor as critical to the Company's success. Tanner and Kornwasser were key employees of Valeant who remained closely involved in the details of running the pharmacy, including expanding its business.

53.     Valeant employees were placed within Philidor (in addition to Tanner and Kornwasser) to supervise operations at the pharmacy and increase the sale of Valeant drugs. For instance, Valeant placed a 30-person team inside Philidor with instructions to show doctors how to direct patients to Valeant products. At different points in Philidor's evolution, Valeant employees were responsible for performing a variety of key business

functions for the pharmacy, including interviewing Philidor job applicants and overseeing the pharmacy's billing operations.

54.    In order to conceal Philidor's connection to Valeant, these employees used aliases when sending emails from Philidor accounts. For example, one Valeant employee who also worked for Philidor, Bijal Patel, was instructed to use "Peter Parker" as an alias (the comic book character Spiderman's real name) when sending emails from his Philidor account to obscure the fact that he was employed by both Valeant and Philidor. For the same reason, other Valeant employees used email aliases such as "Jack Reacher" (the protagonist of a series of books written by Lee Child) and "Brian Wilson" (the lead singer and songwriter of the Beach Boys).

55.    After Philidor was formed, a host of Philidor-affiliated shell companies attempted to acquire interests in smaller retail pharmacies all over the United States and secretly extend their captive pharmacy network. The network extended to at least 76 "phantom" pharmacies by causing Philidor or its affiliates to file with state regulators pharmacy applications on behalf of various shell companies that Philidor used. In order to keep their captive pharmaceutical network a secret, the shell companies made false and misleading statements in pharmacy applications filed with state regulators that failed to disclose the companies' relationship with Valeant and Philidor. For example, on May 16, 2014, the California State Board of Pharmacy denied Philidor's application, finding that Philidor and its CEO, Andrew Davenport ("Davenport"), knowingly made false statements concerning its ownership and management, and that they made these statements "with the intent to substantially benefit [Philidor and Davenport]," and that Philidor and Davenport, by virtue of their false statements, were "guilty of unprofessional conduct." The California

State Board of Pharmacy affirmed its denial of Philidor's pharmacy license in February 2016.

56.     Isolani, a Philidor-related entity, purchased a California-based mail order pharmacy R&O, in an agreement dated December 1, 2014. After the purchase through Isolani, R&O began dispensing thousands of prescriptions, dwarfing the size of its business prior to its acquisition. These new prescriptions were extraordinarily expensive for simple dermatological conditions like acne or eczema – all for drugs manufactured by Valeant. It was only when R&O began its own investigation into Philidor that it discovered the relationship between Philidor and Valeant. In connection with its purchase of R&O, Isolani concealed from California regulators its relationship with Philidor and Valeant.

57.     Back Rank, LLC ("Back Rank"), a Philidor-controlled shell company, whose managing member, James R. Fleming ("Fleming"), was Philidor's Controller, and whose address was the same as a listed Philidor mailing address, attempted to take ownership of Houston-based Orbit Pharmacy, Inc. ("Orbit"). In a September 2015 application filed with the Texas State Board of Pharmacy, Orbit represented that no state had ever denied a pharmacy application filed by any of the "the pharmacy's owner[s] or partner[s]." In reality, California had denied Philidor's pharmacy application the previous year. Orbit's false and misleading representation concealed its connection with Philidor and Valeant from state regulators.

58.     To date, Defendants have not disclosed the full scope of Valeant's secret pharmacy network and the identities of all the pharmacies and shell companies that comprised Valeant's secret network of pharmacies. However, elements of that network have become public.

- 17 -

59.     On December 15, 2014, Valeant rewarded Philidor's owners when it paid $100 million for the option to acquire Philidor for $0 for ten years, plus various milestone payments based on Philidor's sales. The first milestone payment of $33 million was paid on January 15, 2015. The remaining milestone payments were tied to Philidor hitting sales targets. Valeant's little known subsidiary, KGA, was used to obtain the option to acquire Philidor. Notably, the Purchase Option Agreement provided that Philidor was to enter into a purchase agreement with Isolani as a condition to the acquisition and stated that Philidor's business "ha[d] been conducted in the Ordinary Course of Business" since December 31, 2013.

60.     The Philidor purchase agreement also gave Valeant, through KGA, the right to form a joint steering committee to "assess and discuss" matters relating to legal compliance and Philidor's "internal policies, manuals and processes," including amending existing policies or establishing new ones. Significantly, it documented Valeant's right to "make the final determination" regarding all matters with respect to "the Strategic Plan of Philidor" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third Party Payors) and the Company's internal policies and manuals" in the event of any tie of the joint steering committee members. The agreement provided for meetings and reviews of Philidor's strategic plan and compliance matters, including Philidor's policies and manuals. The joint steering committee also had "the right to review, prior to their submission, all applications of the Company for licenses and permits (including state pharmacy licenses)."

61.     Prior to Valeant's $100 million payment to Philidor, Valeant's senior management and members of the Board of Directors, including the entire Audit

- 18 -

Committee, went on site visits to Philidor, during which time Valeant was provided further access and exposure to Philidor's business practices and operations. After the payment, Valeant intentionally avoided disclosing its relationship with Philidor in its financial statements. Defendants concealed from investors, as well as, physicians, patients, private payors, and PBMs the $100 million payment, Valeant's controlling relationship and that Philidor's financials were being consolidated into Valeant's.

62.     On December 15, 2014, Valeant and Philidor also entered into a distribution and services agreement. Kellen signed on behalf of Valeant with Davenport, Philidor's CEO, signing for Philidor. Products covered by the agreement included, among others, Elidel, Jublia, and Solodyn. In the agreement, Philidor represented it would "operate in full compliance with all licenses and permits required by Laws and all contracts with participating insurance companies and Third Party Payors." The agreement gave Valeant the right to inspect Philidor's policies and procedures and do site visits to verify such compliance. Defendants knew, or were negligent in not knowing, that Philidor clearly did not comply.

63.     Defendants also knew that, at a minimum, after the formal consolidation of Philidor was completed Valeant was prohibited from recording revenue for shipping products to Philidor, because that was akin to shipping products to itself. Instead, Valeant would have to wait until Philidor shipped the products to patients. Therefore, before the agreement was signed in December 2014, Valeant shipped millions of dollars of products to Philidor to inflate revenue. This manipulative practice was a clear violation of Generally Accepted Accounting Principles ("GAAP") which made the 2014 financial results published by Valeant misleading.

64.     A primary purpose behind Defendants' secret network of pharmacies was to ensure that Valeant's branded drugs would be insulated from competition with cheaper alternatives (including generics) at the retail outlet, where such competition occurs as a result of the incentives to pharmacies and patients. Valeant's dermatological products were especially sensitive to such competition.

65.     Through Valeant's secret network of captive pharmacies, Defendants were able to channel prescriptions for Valeant's branded drugs, including those ostensibly dispensed by smaller retail pharmacies in their captive network, through Philidor, where Valeant and Philidor employees used various means to ensure Valeant's branded drugs – and not competitors, including generics – were dispensed.

66.     Philidor engaged in a host of improper, contractually prohibited, and/or deceptive practices to increase reimbursement of Valeant products. A department within Philidor was set up to receive prescriptions from doctors and process them through insurers.

67.     A separate department at Philidor, the adjudication department, existed to seek insurance coverage for Valeant drugs. The adjudication department at Philidor committed some of its most egregious acts while under the direction of Valeant and/or its employees and/or due to the reckless indifference of Valeant, and in furtherance of Defendants' scheme and deceptive course of business. Philidor documented many of these deceptive practices in a training manual entitled the "Adjudication Reference Binder," and other materials. Philidor's improper tactics included, among other things: (i) instructing employees to use a National Provider Identification Number ("NPI") other than Philidor's with a TPP or the PBM agents if a previous Philidor claim had been rejected to indicate

- 20 -

that a prescription was filled by a pharmacy other than Philidor, as part of a "back door" approach to receive insurance payments – in other words, to claim that a pharmacy had dispensed a prescription it did not in fact dispense; (ii) operating a pharmacy without a license by using the NPI's of other pharmacies in Philidor's network to fill prescriptions and obtain reimbursements in states where Philidor was not licensed, including California; (iii) altering prescriptions without the consent of the prescribing physician or the patient, making it appear as though the physician or patient desired Valeant's expensive branded drug, rather than the cheaper alternative; (iv) misrepresenting drug prices to manipulate the usual and customary price of a drug in favor of seeking reimbursement for the maximum allowable price under existing insurance coverage; (v) misrepresenting drug quantities by lowering the amount per prescription if a claim for reimbursement was rejected by the insurer and then resubmitting the claim with a lower quantity so the price would be lower in order to secure insurance approval, and then increase the number of prescription refills in order to secure the maximum reimbursement; (vi) waiving copays through PAPs or making no reasonable effort to collect applicable copayment amounts from patients; and (vii) automatically refilling prescriptions by enlisting patients in an unadvertised auto-refill subscription program for Jublia that automatically delivered more prescriptions and charged ongoing copays for the service. On October 22, 2015, Bronte Capital and blogger commenters revealed additional anecdotal evidence that patients had been enrolled in and were receiving automatic refills associated with Jublia.

68.     Fourteen states, including Pennsylvania (the state in which Philidor was headquartered), require pharmacists to substitute generic equivalents for branded drugs. Moreover, contracts between pharmacies and TPPs or their PBM agents typically require

the pharmacy to dispense a generic substitute for a branded drug where available. Defendants' refusal to substitute generic alternatives for expensive Valeant-branded drugs, despite their widespread availability, violated these statutory and contractual mandates.

69.     Ordinarily, the fact that a high volume of claims for expensive branded drugs from a single manufacturer were coming from a single pharmacy that was failing to substitute generic drugs for any of that manufacturer's drugs – *i.e.*, Philidor – would have triggered heightened scrutiny and denials of claims from PBMs and scrutiny of the pharmacy's practices. However, by concealing Valeant's relationship with Philidor, its relationships with its network of pharmacies, and the pharmacies' relationship to each other, Defendants were able to spread claims across ostensibly unrelated pharmacies. This caused Defendants' deceptive practices to go undetected by creating the false impression that scores of pharmacies had independently determined to dispense Valeant's high-priced branded drugs for legitimate reasons and burying the improper claims among the large volume of the pharmacy network's claims.

70.     Accordingly, secrecy was essential to Defendants' scheme, and Defendants went to great lengths to ensure that Valeant's ownership of Philidor and its network of captive retail pharmacies remained concealed from the public, including from TPPs and PBMs. For example, neither Philidor nor any of the other captive pharmacies in Defendants' network disclosed to the TPPs or PBMs – with whom they were negotiating contracts, reporting audits, submitting claims or otherwise transacting business – their relationship with Valeant.

71.     Valeant never disclosed Philidor in any of its SEC filings prior to October 19, 2015. Likewise, Philidor never publicly discussed the nature of its relationship to Valeant prior to October 19, 2015.

72.     On October 29, 2015, investigative journalists reported that former Philidor employees admitted Philidor's deceptive practices and provided Philidor manuals documenting some of those practices, including "a couple of different 'back door' approaches to receive payment from the insurance company." In response to these revelations, the three major PBMs (Express Scripts, CVS Caremark, and OptumRx) announced that they would no longer reimburse prescriptions from Philidor; and Valeant (which had vigorously defended Philidor only days before) announced it would sever ties with Philidor, implicitly conceding the deceptive conduct and forcing Philidor to close.

### D.     The R&O Lawsuit

73.     On December 1, 2014, Russell Reitz ("Reitz"), a Southern California pharmacist, sold R&O, a specialized dispensary for gastroenterology patients, to Philidor. Through the sale, Reitz learned that Philidor was not licensed by the California State Board of Pharmacy.

74.     Following the sale, R&O was inundated with thousands of prescriptions from doctors using Philidor's mail-order service, numbers dwarfing the customary size of R&O's business. Philidor would send R&O bulk orders of Valeant-branded pharmaceuticals, and Reitz would dispense these drugs to patients directly or by mail. Payment later arrived in the form of paper checks from health insurers, with each check covering hundreds of patients and typically made out for over one million dollars.

75.     Not only was the volume of Philidor-channeled patients unusually large, the prescriptions that Philidor was filling were also extraordinarily expensive, even compared to the specialized prescriptions R&O usually dispensed. Yet, most of the overpriced prescriptions R&O was filling were Valeant drugs indicated for simple dermatological conditions, such as Solodyn for acne, Elidel, an eczema treatment, and Jublia, a topical treatment for toenail fungus.

76.     In March 2015, Reitz received an audit from one of his PBMs. The audit showed that R&O was being used by Philidor to fill thousands of prescriptions all across the country. These prescriptions had been filled with Reitz's name and R&O's NPI, but they were dispensed to patients of whom Reitz had never heard. Many were for medications that R&O didn't carry. Some prescriptions were even backdated to before Reitz had sold R&O to Philidor. These practices continued throughout the summer of 2015.

77.     As a result of these suspicious practices, in the summer of 2015, R&O began investigating Philidor. R&Os investigation uncovered that in 2013, Philidor had filed an application with the California State Board of Pharmacy – which, as noted above, California denied because Philidor made "false statements of fact" in its pharmacy application. Upon learning that Philidor had been denied access to the California pharmaceutical marketplace, Reitz realized that Philidor's purpose for the R&O purchase was to use R&O as a channel through which Philidor would secretively conduct its own business in California and circumvent the licensing board's denial.

78.     On July 14, 2015, Reitz wrote an email to Eric Rice ("Rice") to address "the issue of Philidor's improper, and perhaps illegal, use of my [pharmacy] number without my knowledge or consent to bill for prescriptions that were" either filled by other

pharmacies or billed before the execution of the agreement to purchase R&O. Reitz demanded that they cease the practices immediately. Reitz added that the agreement required Philidor/Isolani to apply for a permit and that "this process does not take 7 months" and asked for all documents relating to the application.

79.    On July 19, 2015, Davenport emailed Reitz stating that Philidor stopped using R&O's NPI number and "halted activity pending coming to some alignment with you." The next day, Reitz wrote back asking why "Philidor is responding to my concerns instead of Eric Rice" who executed the agreement on behalf of Isolani. Reitz further stated that he learned that Rice signed off on the "Argus-Humana audit, the same audit I refused to sign," and "Eric Rice is not the PIC [pharmacist-in-charge] (I am) and has never stepped through R&O's doors. I am not sure how he could verify the accuracy of anything pertaining to that audit."

80.    On July 21, 2015, Rice and several Philidor executives, including Davenport, Fleming, and General Counsel Gretchen Wisehart, flew to California to meet Reitz at R&O. The meeting did not satisfy R&O's concerns, and the next day counsel for R&O sent a letter to Rice noting that they "appear[ed] to be engaging in a widespread fraud." On August 18, 2015, Fleming emailed Reitz suggesting responses to an audit. One of the issues identified in the audit was the large number of prescriptions being filled by R&O that were shipped to patients from Pennsylvania, where Philidor was based.

81.    On August 31, 2015, counsel for R&O sent a notice of termination to Isolani's law firm. R&O's counsel wrote "[i]t is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to sign the [Sale, Management Services, and related] Agreements in order to allow Isolani/Philidor to engage in a massive fraud." R&O's

counsel added that "Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks." R&O's counsel noted that Philidor had been denied a California license and "targeted Mr. Reitz and R&O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts" and "Philidor then created Isolani as the instrumentality to improperly use R&O's prescription provider identification numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have had access to but for R&O." Counsel added that "Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's written assurance, Isolani/Philidor continue to use R&O's . . . NPI numbers to bill payors for prescriptions dispensed by Philidor." R&O's counsel also asserted that "Mr. Reitz now has concrete evidence that representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O . . . to certain payors."

82.    In response to Reitz's investigation of Philidor, Reitz received letters, not from Philidor, **but from Valeant's General Counsel**, demanding $69 million in payments from R&O. These letters made clear that Valeant was not simply a drug manufacturer supplying Philidor, **but rather that Valeant was acting in concert with Philidor to perpetrate the conduct of which Reitz complained**.

83.    On September 6, 2015, Isolani's counsel sent an email informing R&O's counsel that they were seeking a protective order against Reitz and for an accounting. Counsel for R&O responded that Isolani had known for "at least six weeks that Mr. Reitz was in receipt of checks paid to his company to protect himself and his company from the

massive potential/actual civil, regulatory and even potential criminal liability that your clients have exposed him to due to their malfeasance," adding that the conduct was outlined in prior correspondence "to which your clients have provided no denials."

84.     R&O claimed it never received a previous invoice from Valeant for any amount and that either Valeant and R&O are "victims of a massive fraud perpetuated by third parties," or that "Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others."

85.     Reitz subsequently filed suit against Valeant. The ensuing disclosures, including the facts detailed above, set off a chain of events partially revealing the truth about Valeant's network of covert captive pharmacies.

### E.     Defendants' Scheme Is Revealed Through a Series of Partial Disclosures, Causing Valeant's Stock Price to Decline as Defendants Continue to Mislead Plaintiff

86.     On October 19, 2015, the Company reported its third quarter 2015 financial results and hosted an earnings conference call (which started before the market opened). During the conference call, prompted by a report by Southern Investigating Reporting Foundation, the Company revealed certain (but not nearly all) of the facts concerning its direct relationship with and reliance on certain specialty pharmacies, including Philidor. Defendants also disclosed Valeant's option to purchase Philidor. In addition, the Company contradicted earlier representations that volume was the primary engine for revenue growth and disclosed that pricing accounted for approximately 60% of its growth in 2014 and 2015.  Valeant asserted that it would be making drug pricing a smaller part of growth going forward, and that R&D would become an increased area of focus. After the market closed on October 19, 2015, *The New York Times* published an article that described Valeant's

use of Philidor as "a new way of trying to keep the health system paying for high-priced drugs."

87.     Valeant stock declined by nearly 8%, falling from a close of $177 per share on Friday, October 16, 2015 to a close of $163 per share on Monday, October 19, 2015, on elevated trading volume. The following day, Valeant shares fell an additional 10% to close at $146 per share on October 20, 2015, also on high trading volume. The total stock price decline over this two-day period was over 17%, or $30 per share.

88.     On October 21 and 22, 2015, the market learned of additional problems regarding Valeant's secret relationships with specialty and "affiliate" pharmacies, including Philidor and R&O, and related issues regarding Valeant's accounting practices. On October 21, 2015, Citron published a research report questioning the relationship between Valeant and Philidor and Valeant's attendant accounting practices, and suggesting that Valeant had created a network of "phantom" specialty pharmacies for the purpose of inflating the Company's revenues. The Citron report also provided further details of the lawsuit between R&O and Valeant, where R&O accused Valeant of "conspiring . . . to perpetrate a massive fraud." After Citron's report was published, trading in Valeant shares was temporarily halted because of the rapid decline in the price of Valeant shares. Specifically, as a result of the information provided to the market on October 21, the price of Valeant stock dropped more than 19%, from a close of $146 per share on October 20, 2015, to a close of $118 per share on October 21, 2015, on extraordinary trading volume.

89.     After the market closed, Philidor issued a press release disclosing its contractual relationship with "affiliated pharmacies," including R&O, and that it had a right to acquire such pharmacies now or in the future subject to regulatory approval. The

following day, analysts reacted to the disclosures regarding Philidor. Opinions varied. For example, before the market opened on October 22, 2015, BMO issued a report downgrading its rating of Valeant and concluding that Valeant's arrangements with Philidor were "not just aggressive, but questionable." As analysts reacted to the disclosures and the market continued to digest the negative news, the price of Valeant stock continued to decline on October 22, falling an additional 7%, to close at $109 per share on unusually high trading volume. The total stock price decline over this two-day period was over 25%, or $36 per share.

90.     On October 25 and October 26, 2015, the market learned of additional facts concerning Valeant's improper relationship with and reliance on its specialty pharmacies network. On Sunday, October 25, 2015, *The Wall Street Journal* reported that former Philidor employees had revealed that Valeant employees worked directly at Philidor and were using fictitious names in order to conceal the companies' relationship "so it didn't appear Valeant was using the pharmacy to steer patients" to Valeant products. Before the market opened on October 26, 2015, Valeant filed its third quarter 2015 Form 10-Q ("3Q15") and hosted a conference call. During the conference call, Defendant Pearson attempted to reassure investors Valeant's relationship with Philidor was completely proper. In the call, however, Pearson acknowledged that the Company had the "power to direct" Philidor's activities, and that the Company was conducting an investigation, through an Ad Hoc Board committee, into its relationship with Philidor. Later that day, *Bloomberg* reported that the remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor." As a result of this news, the price of Valeant stock dropped more than 5%, from a close of $116 per share on Friday,

October 23, 2015, to a close of $110 per share on Monday, October 26, 2015, on unusually high trading volume.

91.     On October 28, 2015, further information was revealed to the market regarding Valeant's secretive relationships with, and reliance on, specialty pharmacies, including Philidor. On that day, *Bloomberg* reported that Philidor used "back door" tactics to increase payments and "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim – to essentially shop around for one that would be accepted." Then, on October 29, 2015, *Bloomberg Businessweek* reported on additional improper business practices at Philidor, including that Philidor was falsifying prescriptions to boost Valeant sales, based on the accounts of former Philidor employees and internal company documents. During market hours on October 29, 2015, reports surfaced that CVS Caremark – one of the nation's three largest PBMs – had terminated its relationship with Philidor following an audit of Philidor's practices. As a result of this news, the price of Valeant stock dropped nearly 5%, from a close of $117 per share on October 28, 2015, to a close of $111 per share on October 29, 2015, on unusually high trading volume.

92.     After the market closed on October 29, 2015, the nation's other largest PBMs, Express Scripts and OptumRx, announced that they too had terminated their relationships with Philidor. Before the market opened on October 30, 2015, the Company issued a press release stating that it would be terminating its relationship with Philidor and that Philidor would be ceasing operations as soon as possible. On this news, Valeant shares fell by nearly 16%, from a close of $111 per share on October 29, 2015, to a close of $93 per share on October 30, 2015, on unusually high trading volume.

93.    On November 4, 2015, before the market opened, the Senate Aging Committee announced that it had formally launched a probe and requested documents and information from Valeant regarding its drug prices. That same day, also before the market opened, *Bloomberg* reported that just weeks prior to the Company's announcement that it was cutting ties with Philidor, Valeant had planned to expand its use of Philidor, which further called into question the viability of the Company's recently issued financial guidance. After the market closed on November 4, 2015, *The Wall Street Journal* reported that Valeant's largest shareholder, Ackman, was considering liquidating his entire $3.8 billion stake in the Company and had demanded that Valeant management "come clean" about Philidor.

94.    On this news, the price of Valeant stock dropped by approximately 6%, from a close of $97 per share on November 3, 2015, to a close of $91 per share on November 4, 2015, on elevated trading volume. Valeant shares continued to decline the following day, falling by more than 14%, to close at $78 per share on November 5, 2015, on extraordinary trading volume. The total stock price decline over this two-day period was 19.5%, or $19 per share.

95.    On November 10, 2015, before the market opened, Valeant hosted a business update call and disclosed the "significant" negative financial impact that Philidor's closing and the Government's probes into its pricing practices were having on the Company, including with respect to its financial guidance. In particular, Valeant disclosed that there would be a significant short-term disruption to the Company's dermatology division, that the Company was seeing short-term pressure in its neurology business, and that the Company was "working to quantify the potential short-term impact"

- 31 -

on the fourth quarter 2015 ("4Q15") of the termination of its relationship with Philidor. The Company "asked Philidor . . . to fill all prescriptions at no cost for the week" and also acknowledged that filling prescriptions for free would "obviously" have an impact on the rest of the quarter and that if Valeant's pricing is "viewed as aggressive we're going to have to listen to that." On this news, Valeant stock dropped 2%, from a close of $85 per share on November 9, 2015, to a close of $83 per share on November 10, 2015, on unusually high trading volume.

96.     After the market closed on November 10, 2015, it was reported that the Sequoia Fund, Valeant's biggest shareholder, had paid and was offering to pay Philidor employees in order to obtain information regarding Valeant's practices. The next day, before the market opened, *Bloomberg* reported that Valeant's creditors were "[s]pooked" by a possible "[r]evenue [s]queeze" and concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden." During market hours on November 11, 2015, analysts at Nomura cut their Valeant price target. On this news, the price of Valeant stock continued to decline, falling by over 5%, to close at $78 per share on November 11, 2015.

97.     On November 12, 2015, before the market opened, *Bloomberg* published another article regarding Valeant's relationship with Philidor, and multiple media outlets reported that analysts at several firms had lowered their price targets for Valeant. On this news, Valeant's stock price dropped an additional 6.5%, to close at $73 per share. The total stock price decline from November 10 through November 12, 2015 was over 13%, or $11 per share.

98.     On November 16, 2015, during market hours, *Bloomberg* reported that Congressman Elijah Cummings wrote Pearson requesting that Pearson make certain Valeant employees available for interviews. After the market closed that day, *The Washington Post* reported that the House Oversight Committee announced it would hold a hearing in early 2016 on prescription drug pricing, and that it had contacted Valeant to gather information. The article also disclosed that members of the House Oversight Committee were urging Valeant's executives to testify at the hearing and for Valeant to be subpoenaed. On this news, the price of Valeant stock dropped by nearly 3%, from a close of $75 per share on November 13, 2015, to a close of $73 per share on November 16, 2015, on unusually high volume.

99.     On November 17, 2015, Deutsche Bank published a report detailing a survey it commissioned of 25 dermatologists in light of the disclosures relating to Philidor and the backlash from doctors refusing to write prescriptions for Valeant products. The vast majority of the doctors surveyed noted that they were prescribing fewer Valeant products and expected to write fewer prescriptions in the future. One doctor responded: "I don't trust Valeant and will avoid their products when there are alternatives." The price of Valeant stock continued to decline on November 17, 2015, dropping an additional 4% to close at $70 on high trading volume.

100.     To stem the bleeding from its termination of the Philidor arrangement, on December 15, 2015, Valeant entered into a distribution with Walgreens. And, on December 16, 2015, Valeant cut its financial guidance again.

101.     On December 17, 2015, before the market opened, Mizuho cut its rating on Valeant stock to "neutral" from "buy." The Mizuho analyst cited a lack of clarity regarding

Valeant's agreement with Walgreens, and stated that Valeant management had "not done a good job in articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist." During market hours that day, *Bloomberg* published an article reporting on the Mizuho downgrade. On this news, the price of Valeant stock declined nearly 6%, falling $7 from a closing price of $118 on December 16, 2015 to close at $111 on December 17, 2015.

102.    On February 19, 2016, media outlets reported on a Wells Fargo analyst report issued the prior day that included an in-depth analysis on Valeant and questioned whether the Company had been truthful about Philidor. In particular, the report questioned whether the Company had been truthful regarding Philidor and Valeant's relationship, including the adverse consequences to Valeant of terminating that relationship, management's credibility, and irregularities with the Company's accounting. The analysis noted that Valeant's "new guidance is not compatible with the data presented by Valeant" and "the reduction in guidance does not match the impact [of Philidor], as described by Valeant." The report stressed that "the slide in Valeant's shares is directly related to decisions that the board and management have made" including "the board review and approval of a relationship with Philidor." The report further noted that Valeant's accounting was misaligned with its purported performance, and suggested that the dramatic rise in Valeant's accounts receivables could be an indication TPPs "are hesitant to pay for products" sold by Valeant or that Valeant "improperly timed recognition of revenue." On this news, the price of Valeant stock dropped by nearly 10%, falling from a close of $94 per share on February 18, 2016 to a close of $84 per share on February 19, 2016, on elevated trading volume.

103.   On February 22, 2016, a Wells Fargo analyst released an updated note regarding Valeant that included two additional valuation models and a $62 price target. Also on February 22, 2016, CVS announced it would restrict the use of Jublia, one of Philidor's most heavily distributed drugs, by requiring patients to first try a less expensive generic drug. In speaking with Bloomberg's Robert Langreth, CVS's chief medical officer stated "Older nail-fungus medicines are 'much more efficacious' than Jublia and cost far less.  It is a circumstance where we can go to clients and say, *this is just waste we are eliminating*."  Wells Fargo analysts also noted that "*a substantial portion of Jublia's growth was fueled by Philidor and anticipate a significant negative impact to Jublia from the termination of Philidor and shift to Walgreens*." CVS's refusal to sell Jublia was a straightforward example of how independent pharmacies (unlike Philidor) acted to cut costs for TPPs and PBMs, and exemplified why Valeant secretly used Philidor to charge TPPs and PMBs more for its products.

104.   After the market closed on February 22, 2016, *The Wall Street Journal* reported that Valeant was likely to restate its 2014 and 2015 earnings following an internal review of its financials. Later that evening, the Company confirmed in a release that it would be restating its 2014 earnings by at least $58 million, which would reduce 2014 GAAP earnings per share ("EPS") by approximately $0.10. The Company disclosed that it had been improperly recognizing revenue upon the delivery of products to Philidor, instead of when the products were dispensed to patients. The Company also announced it would delay filing its 2015 Form 10-K pending completion of related accounting matters. Defendant Schiller commented that the Company would be "improving reporting procedures, internal controls and transparency for our investors." On this news, the price

of Valeant stock dropped by over 10%, from a close of $84 per share on February 19, 2016 to a close of $75 per share on February 22, 2016, the next trading day, on unusually high trading volume. Valeant shares continued falling in after-hours trading on February 22, 2016 as news of the impending restatement hit the market, dropping as low as $68 per share.

105.    On Sunday, February 28, 2016, Valeant issued a press release announcing Pearson's immediate return as CEO and the cancellation of a conference call set for February 29, 2016 concerning preliminary fourth quarter 2015 ("4Q15") financial results and updated guidance for 2016. The press release also disclosed that the Company was ***again*** withdrawing its prior financial guidance, and confirmed that it would delay filing its 2015 Form 10-K pending completion of the review of accounting matters by the ad hoc committee "and the Company's ongoing assessment of the impact on financial reporting and internal controls." Withdrawing financial guidance, ***again***, indicated to investors that Valeant was not being honest with investors and Philidor's impact on Valeant was bigger than Defendants cared to admit. Numerous media outlets reported on these disclosures prior to the market's opening on February 29, 2016. Also during market hours, Moody's placed Valeant ratings on review for potential downgrade on concerns that the Company's operating performance was weaker than expectations, potentially impeding deleveraging plans. As the day progressed, additional reports surfaced, and the Company ultimately confirmed that Valeant was under investigation by the SEC and had received a subpoena during 4Q15.

106.    On this news, the price of Valeant stock dropped by more than 18%, from a close of $80 per share on February 26, 2016 to a close of $65 per share on February 29, 2016, the next trading day, on unusually high trading volume.

107.    On March 15, 2016, before the market opened, Valeant issued its preliminary unaudited 4Q15 financial results and held a much-anticipated conference call. The Company revealed that it was (*again*) reducing its financial guidance for 2016, and provided certain unaudited financial information concerning its 4Q15 performance. In particular, the Company slashed its 2016 revenue guidance from $12.5-$12.7 billion to $11-$11.2 billion; reduced its Cash EPS guidance from $13.25-13.75 to $9.50-10.50; and cut its EBITDA guidance from $6.7-$7.1 billion to $5.6-$5.8 billion. The Company cited as reasons for these substantial downward revisions "reduced revenue assumptions for certain businesses, new managed care contracts and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016." The Company also reported $51.3 million in "wind down costs" for Philidor, including "write-downs of fixed assets and bad debt expenses," and a $79 million impairment charge related to Philidor. During the conference call, Defendants disclosed that the Company's press release from earlier that morning was inaccurate because it forecasted adjusted EBITDA for the next four quarters of $6.2 to $6.6 billion, when the figure should have been only $6.0 billion. That same day, Moody's downgraded Valeant's credit ratings, as well as those of its subsidiaries.

108.    Valeant's repeated reductions in guidance greatly concerned investors that management was not being honest and/or that the Company's problems resulting from its improper practices were spiraling out of control. On this news, the price of Valeant stock

plummeted by more than 50%, from a close of $69 per share on March 14, 2016 to a close of $33 per share on March 15, 2016, on extremely high trading volume.

109.    On March 22, 2016, *Business Insider*, in an article entitled "Bill Ackman's Plan to Fix Valeant Is Doomed," attempted to quantify the impact of the change in business strategy from Valeant's non-traditional approach to that of a traditional pharmaceutical company. The article noted that without price hikes, "Valeant would lose 10% of its revenue." The analysis showed that operating margins would decrease from 24% to 7% and with an increase in R&D spending to 13% instead of 3% that "Valeant would be losing money. *A lot of money.*" (Emphasis in original.) The article noted that, according to an analysis conducted by *Bloomberg*, "[i]f Valeant was operating more like a traditional specialty pharma company, it could have had a trailing 12-month (4Q15) loss of $2.44 rather than an adjusted EPS of $1.53. Ebit could have dropped to $606 million from $2.5 billion . . .Valeant could have had an adjusted net loss of $842 million instead of net income of $527 million."

110.    On April 9, 2016, *The New York Times* published an article titled "The Female Viagra, Undone by a Drug Maker's Dysfunction" which noted that "Valeant dismissed the entire sales force behind [Addyi]" and "doctors had prescribed the drug fewer than 4,000 times as of February." Citing interviews with former employees, analysts, investors and doctors, the article attributed Addyi's failure to Valeant's pricing actions and reliance on Philidor. The article explained that Sprout (the maker of Addyi) had determined that Addyi should be sold at $400 and "Anthem, one of the nation's largest insurers, said it would cover the drug at the $400 price." However, once Valeant acquired the drug, it doubled the price to $800 causing payors to reconsider their coverage. Valeant also

terminated Sprout's distribution agreement with Cardinal Health, deciding instead to rely on Philidor.

111.    On April 29, 2016, Valeant released its annual report on Form 10-K for the year ended December 31, 2015 ("2015 10-K") which confirmed the financial restatement and the Company's material weaknesses. Additions to the 2015 10-K demonstrated the inadequacy of the disclosures in the Company's prior annual and quarterly reports.

112.    On May 3, 2016, Valeant announced the appointment of Joseph C. Papa ("Papa") as its CEO and Chairman of the Board, reuniting the roles it recently separated. Three weeks later, on May 23, 2016, Papa spoke publicly at the UBS Global Healthcare Conference. While answering questions from investors and analysts, Papa described Valeant as "a great turnaround opportunity" and discussed a number of the challenges he inherited. Papa acknowledged that with Philidor "clearly we had some question marks" and that "there were some pricing mistakes that were made" and "some transparency things that [could be] improve[d] on at Valeant." Regarding internal controls, Papa recognized "there are some functions that we need to put some additional . . . controls" and "there is some investment that needs to happen in areas," such as finance, "where [Valeant] just need[s] to bring some additional financial capabilities." To that end, Papa disclosed that the Company "just recently hired a new Controller."

113.    On June 7, 2016, Valeant made additional disclosures regarding the financial impact of shutting down its captive pharmacy network, restricting the Company's ability to price gouge and engage in deceptive practices. That day, Valeant filed its first quarter 2016 Form 10-Q ("1Q16 10-Q"), issued a press release, and hosted a conference call regarding the Company's long-awaited first quarter 2016 ("1Q16") financial results,

- 39 -

which had been delayed by several months. Valeant disclosed a GAAP loss per share of ($1.08) for 1Q16 and significantly lowered its 2016 guidance (*again*) to total revenue of $9.9-$10.1 billion (down from $11-$11.2 billion), adjusted EPS (non-GAAP) of $6.60-$7.00 (down from $8.50-$9.50), and adjusted EBITDA (non-GAAP) of $4.80-$4.95 billion (down from $5.6-$5.8 billion). During the conference call that day, Rosiello stated that "[t]he base business in Q1 declined by $289 million, driven by dermatology . . . and the transition to Walgreens."

114.    Further revealing the detrimental effect that the loss of Philidor was having on Valeant's pricing, volume, and drug refills, Rosiello added that:

> Following the launch of the Walgreens program in January, we saw volume flattening and ASPs [average selling price] declining post launch. Overall volume challenges were exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy [Philidor] relationship, as well as the negative external narrative and some internal disruptions

115.    Papa added that the "vast majority" of Valeant's "revenue shortfall in dermatology in our revised guidance relates to this average selling price shortfall." During the question and answer portion of the call, Papa further revealed how much the Company's drug pricing and profitability were suffering as a result of its cessation of price gouging and deceptive practices and the termination of its relationship with Philidor, and Valeant's new relationship with Walgreens:

> The issue is that there is a percentage of the business where the average selling price is significantly below what we had previously expected as we put the program together. And in fact, in some places that average selling price is negative and by that [it] means, every time a prescription goes out the door we're taping dollar bills to that prescription as it goes out the door. That's something that we have to get fixed.

116.     In response to this news, Valeant common stock declined a further $4.21 per share from a price of $28.85 per share at the close of trading on June 6, 2016, to a price of $24.64 per share at the close of trading on June 7, 2015 – a decline of over 14.5%.

117.     On July 31, 2016, *The New York Times* published an article titled, "How Valeant Cashed In Twice on Higher Drug Prices," which detailed Valeant's use of "price appreciation credits" to inflate the Company's revenues. The article explained that the credits – which come about when a drug company increases the cost that its wholesalers must pay for a product they have contracted to distribute – were "an obscure but vital source of cash to Valeant that is directly linked to its pricing practices." As reported by *The New York Times*, "[n]ow that those practices are under scrutiny, the money Valeant receives from these credits is likely to decline substantially or disappear outright," noting the "unique" and "outsize contributions" of the credits to Valeant's cash flows. "In recent periods, they have equaled one-fifth or more of Valeant's operating cash flow," the article emphasized, based on the Company's reported financials.

118.     On August 9, 2016, Valeant issued a release and hosted a conference call regarding the Company's second quarter 2016 ("2Q16") financial results. In the release, Valeant disclosed a GAAP loss per share of ($0.88) for 2Q16 and a drop in revenue of 11.4%, with the Company blaming the slow recovery in its dermatology division, which suffered greatly from Philidor's closing. The release disclosed that Valeant's dermatology revenue dropped 55% compared to 2Q15, with Solodyn and Jublia sales down 74% and 69%, respectively, year-over-year. In the conference call that day, Papa stated: "I don't want to suggest for an instant that there [aren't] challenges" and that it "will take time to implement and execute our turnaround plan."

119.     Additionally, the Company cited lower price appreciation credits as one of the reasons revenues declined 14% in Developed Markets.

120.     Also on August 9, 2016, in an article titled "Valeant Begins to Look Like A Normal Drug Company, But With Way Too Much Debt," *Forbes* reported on an analysis by Wells Fargo financial analyst Maris. Further demonstrating the challenges facing the Company following the closure of its secret pharmacy network and the cessation of its deceptive practices, *Forbes* noted that by Maris' calculations, "Papa will have to deliver a 55% sequential increase in adjusted EPS and a 30% increase in adjusted EBITDA in the second half of 2016 to meet guidance" and that "Xifaxan remains off pace to hit $1 billion in 2016 sales, a previous Valeant target." Quoting Maris, *Forbes* added that: "If Papa falls short in coming quarters, it is likely many will see the company's new reign as 'just new paint on the same old shed . . . .'"

121.     On November 8, 2016, Valeant issued a release and hosted a conference call regarding the Company's third quarter 2016 ("3Q16") financial results. The Company reported a smaller-than-expected quarterly profit that it attributed to faltering sales of its dermatology products and irritable-bowel-syndrome drug, and it cut its full-year profit and revenue forecasts. After cutting guidance, Valeant expected total revenue of $9.55 billion to $9.65 billion for the year, down from its previous forecast of $9.9 billion to $10.1 billion. Adjusted earnings were forecast to be $5.30 to $5.50 per share compared with the previous forecast of $6.60 to $7.00. The Company also announced a net quarterly loss of $1.22 billion, or $3.49 per share. Revenue fell 11% to $2.48 billion, compared with the average estimate of $2.49 billion. Sales in Valeant's Branded Rx unit, which contributed 34% to the total revenue, fell to $847 million from $1.1 billion in the quarter. The Company also

took a goodwill impairment charge of $1.05 billion in the quarter, reflecting the lower fair value of some US businesses, mainly its Salix division, which makes the irritable-bowel-syndrome drug Xifaxan.

122.    In response to this news, Valeant common stock declined a further $4.15 per share from a price of $19.13 per share at the close of trading on November 7, 2016, to a price of $14.98 per share at the close of trading on November 8, 2017 – a decline of over 21.6%.

123.    On November 30, 2016, *The Wall Street Journal* reported that Valeant's discussions with Japan's Takeda Pharmaceutical Co. to sell its stomach-drug business for roughly $10 billion had broken down "amid last-minute disagreements over price and other matters . . . ."

124.    As well on November 30, 2016, the SEC made public correspondence with Valeant that questioned the Company's use of non-GAAP measures. Wells Fargo's analyst David Maris noted the significance:

> New SEC correspondence reveals potential problems with Valeant's tax accounting and use of adjusted earnings metrics. In a series of letters made available by the SEC today, it appears the SEC has been questioning Valeant in regards to its tax reporting and disclosures, among other items. Recall that in our initiation of coverage report published in February 2016 we wrote extensively about potential problems arising from Valeant's tax reporting, as well as its use of valuation allowances. It also appears from the correspondence that in response to concerns highlighted by the SEC, Valeant is re-assessing its current non-GAAP reporting and disclosures and is likely to present new measures and disclosures with its 2017 guidance and 4Q16 results, including a potential new adjusted net income measure.

125.    In response to this news, Valeant common stock declined a further $1.37 per share from a price of $17.16 per share at the close of trading on November 29, 2016,

to a price of $15.79 per share at the close of trading on November 30, 2016 – a decline of over 7.9%.

126.     On February 28, 2017, Valeant issued a release and hosted a conference call regarding the Company's fourth quarter 2017 ("4Q16") financial results. The Company stated that it was "well poised for a turnaround in 2017"; however, Mizuho analysts Irina Koffler and Andrew Galler noted that there remained "still significant uncertainty in the business." As explained by Koffler and Galler:

> Valeant reported 4Q:16 revs of $2.4B and non-GAAP EPS of $1.26 relative to consensus $2.34B and $1.20. Mgmt also issued FY:17 guidance, guiding to revs of $8.9-$9.1B and adjusted EBITDA of $3.55-$3.70B vs consensus estimates of $8.98B and $3.88B. This lower EBITDA guide could drive weakness in the stock today, in our view. *It still doesn't appear that mgmt. has a realistic outlook on its organic growth* and guided to 2-5% growth in its Branded Rx business and 5-7% growth in its B&L franchise in 2017 (in its slides), in spite of 12.1% Y/Y declines in Brand in 2016, and flat performance in B&L. We reiterate our Underperform rating and will review our $9 PT after the earnings call.

127.     Further, Wells Fargo's analyst David Maris explained:

> In the company's press release, Valeant appears to claim victory by stating it has stabilized and strengthen its business, while dealing with legacy issues, improving operational processes, launching new products, and improving its balance sheet. *We believe investors should review this statement along with the financial statement facts very carefully, as Valeant's franchises all appear to be stagnating or in decline and cash generation continues to deteriorate*. Adjusted EBITDA declined 20% in 2016, and declined 24% 4Q-over-4Q. For full-year 2016, B&L revenue was flat (vs. the previous guidance of growth), Branded Rx revenue was down 12% and Branded operating income was down 21%, while U.S. Diversified product revenue was down 15% and operating profit down 17%. On debt, Valeant still appears to be more than 7x levered at the midpoint of its 2017 adjusted EBITDA guidance, even after subtracting $2.3 billion from total debt, assuming the entire proceeds of the Dendreon and CeraVe sales go to debt pay-down. Valeant's guidance for cash interest expense is approximately $1.75 billion, and at the midpoint of Valeant's adjusted EBITDA guidance, we estimate and interest coverage ratio of 2.07x, which is very close to the 2x interest coverage covenant.

128.    In response to this news, Valeant common stock declined a further $2.33 per share from a price of $16.71 per share at the close of trading on February 27, 2017, to a price of $14.38 per share at the close of trading on February 28, 2017 – a decline of over 13.9%.

## V.    SCIENTER ALLEGATIONS

129.    Defendants participated in a scheme to defraud investors, including Plaintiff, by issuing false and misleading statements about, among other things, Valeant's improper business practices and Valeant's secretive relationships with, and reliance on, specialty pharmacies, including Philidor, to increase the prices of Valeant products and boost the volume of Valeant's sales and operating performance.

130.    In addition, the Individual Defendants had significant motives to engage in the fraudulent conduct. Other facts demonstrating the Individual Defendants' scienter are detailed below. Defendants caused Valeant to use captive pharmacies for the purpose of deceiving PBMs, physicians, and payors through improper practices to boost sales and sale prices of Valeant products. The Individual Defendants were personally aware of, designed, and implemented the deceptive practices detailed herein. The Individual Defendants were also personally aware of, or were severely reckless in disregarding, the improper and deceptive tactics employed by Philidor by virtue of their frequent meetings, effective control over, and contractual right to review and approve Philidor's records and policies.

### A.    Defendants Influenced and Oversaw Valeant's Business Strategy

131.    Pearson was the architect of the Company's business strategy and orchestrated the dramatic price increases and deceptive business practices along with the

other Individual Defendants. Pearson implemented the strategies discussed herein when he became Valeant's CEO, including intentionally concealing that Valeant's network of captive pharmacies facilitated price increases and volume growth. It was a strategy well known to the Individual Defendants who designed, implemented and/or approved of the strategy that allowed Defendants to claim profit margins as high as 99%. A former Valeant executive told *Forbes* that Pearson "wanted to win at all costs and surrounded himself with people who would basically do whatever he told them to do." According to *Forbes,* Pearson "liked to hire cronies like his former McKinsey partner Robert Rosiello, (now Valeant's chief financial officer)," his "brother-in-law [Robert Brabandt], who was paid $299,000 a year," and "Ryan Weldon, head of Valeant's U.S. dermatology operation," who was the son of Pearson's former client, Johnson & Johnson CEO Bill Weldon. Other members of the Board of Directors and executives also had prior ties to Pearson.

132.    Former employees interviewed by *Bloomberg Businessweek* confirmed that Pearson had a hands-on management style and "had his fingers in everything, from operations to making decisions about the salaries of individual employees." *Forbes* also confirmed that Pearson "micromanaged things he deemed important."

133.    During the April 29, 2015 conference call, Schiller commented on his resignation as CFO and confirmed the critical and hands-on role that he and Pearson played in running every aspect of Valeant's business, stating that, "Mike [Pearson] sets the tone at Valeant."

134.    In a May 28, 2014 conference call with investors, Schiller stated that he and Pearson "religiously track each deal on a quarterly basis. Our Board of Directors receives a report every quarter on each deal. We review every quarter and ask ourselves how are we

doing, we are our own biggest critics." Later the same day, at a Sanford C. Bernstein Strategic Decisions Conference, Pearson stated, "we're tracking every product around the world."

135.    Moreover, throughout the relevant period, the Individual Defendants held themselves out to investors as the persons most knowledgeable about Valeant's business, operating model, and strategies (including specialty pharmacies), acquisitions, organic growth, internal controls, ethical standards, compliance programs, and the volume, pricing, and performance of Valeant's products. The Individual Defendants voluntarily and repeatedly chose to discuss these issues throughout the relevant period and in doing so either knew or recklessly disregarded that their statements were contrary to the underlying facts alleged herein, while making the specific and detailed statements alleged herein.

136.    The Individual Defendants were active and culpable participants in the fraudulent scheme and course of business alleged herein by virtue of their receipt of information reflecting the true facts regarding Valeant, their control over and/or receipt of Valeant's materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Valeant's unsustainable business model and its reliance on deceptive practices. The ongoing fraud as described herein was pervasive, multi-faceted, and carefully designed. Such a sophisticated fraudulent scheme could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

137.    The Individual Defendants, as senior executive officers and/or directors of Valeant, were privy to confidential and proprietary, non-public information concerning

Valeant's operations, finances, financial condition, and present and future business prospects, including in connection with due diligence undertaken as part of Valeant's acquisitions, via internal documents and conversations with other officers and employees, and/or attendance at management and/or Board of Directors meetings and committees thereof. Because of their possession of such information, the Individual Defendants had the ability and opportunity to prevent the issuance of the Company's reports and releases alleged herein to be false or misleading and/or to cause them to be corrected. The Individual Defendants' materially false and misleading statements during the relevant period violated their duty to promptly disseminate accurate, full, and truthful information with respect to Valeant's operations, business, financial statements, and financial metrics, so that the market price of Valeant securities would be based upon truthful and accurate information.

138.    Pearson, Schiller, and Rosiello assumed the responsibility of obtaining the requisite knowledge to ensure the Company's disclosures to the market were true by executing Sarbanes-Oxley Act of 2002 ("SOX") Certifications. Pearson, Schiller and Rosiello participated in the drafting, preparation, and/or approval of the various SEC filings, releases, and other public statements complained of herein and because of their managerial positions had control over the information that was disclosed and the true facts relating to those disclosures.

## B.    Defendants' Use of the Covert Philidor Network

139.    The Individual Defendants were personally aware that Valeant used Philidor and its secret network of pharmacies to engage in deceptive practices from Philidor's inception until its closure. They also knew that the relationship was being concealed. The Individual Defendants were intimately involved in the acquisition of

Medicis, which employed an Alternative Fulfillment ("AF") strategy and led to the formation of Philidor on January 2, 2013.

140.   On January 3, 2013, Valeant announced the hiring of Kornwasser. Kornwasser and Tanner were Valeant's main contacts for Philidor. Tanner reported to Kornwasser, who reported to Pearson. Kornwasser's position and compensation within the Company make clear that Philidor was of critical importance to Valeant. Kornwasser received over $8.8 million in total compensation (cash and stock awards) in his first year of employment.

141.   Pearson, Schiller, and senior management signed the Philidor agreements, and Pearson and other executive officers often touted Valeant's new "alternative fulfillment program."

142.   The Individual Defendants knew that several Valeant employees were assisting in the formation of Philidor, working at Philidor, and eventually transferred employment to Philidor, where these employees (both while still employed at Valeant and after transferring to Philidor) would oversee the deceptive business practices designed to artificially boost the sales and sale prices of Valeant drugs.

143.   Prior to obtaining the option to acquire Philidor, Pearson, Schiller, and other Valeant employees performed due diligence, including multiple site visits.

144.   Valeant effectively controlled Philidor from the day it was created. Philidor was formed to orchestrate Defendants' fraudulent scheme to inflate revenues and disguise Valeant's reliance on price increases for growth. Valeant had a contractual right to inspect Philidor's books, records, and facilities and to audit its practices for compliance and either did so, and knowingly approved of the deceptive practices, or was severely reckless in

failing to do so. As Philidor employees have confirmed, the deceptive practices were widely known, discussed, and even documented in Philidor's training manuals. Philidor was included in Valeant's internal control testing and internal audit program for 2015. Valeant and Philidor formed a joint steering committee which held regular meetings to discuss, among other things, Philidor's "Strategic Plan," contractual obligations with TPPs, and "internal policies, manuals and processes."

145.    As a further example that Pearson was personally monitoring Philidor's practices, on March 9, 2015, Kellen sent an email to Pearson updating him on their earlier conversation stating "Met with Deb [Jorn]. . . . Suggested we get all the DMs [District Managers] in for a day. . . goal to go over the practices in each district where Philidor is working well and identify next [approximately] 10 practices where we should push harder to build it out. That [sic] will help fuel growth." Pearson responded, "Good stuff."

146.    Defendants also closely monitored the network of pharmacies through which Philidor operated and Valeant shipped product to and dealt directly with such pharmacies, including R&O. Indeed, in the October 19, 2015 conference call, Pearson acknowledged that R&O was a part of the Company's specialty pharmacy network and discussed the lawsuit R&O filed.

147.    Defendants have *acknowledged purposefully* withholding details concerning the Philidor relationship. On October 19, 2015, as questions about Philidor arose, Pearson, at a conference attended by Rosiello and Kellen, defended Philidor and the decision to conceal the relationship as "a competitive advantage that we did not want to disclose to our competitors." Pearson repeated this at the October 26th conference attended by Schiller, Rosiello, Carro, and Kellen and added that Philidor was purportedly

"independent." Defendants' purported excuse for keeping Philidor secret – it was a competitive advantage – was mere pretext and in no way justified Defendants concealing material information from investors.

148. Defendants' decision to shut down Philidor so quickly, rather than investigating to confirm the devastating allegations, demonstrates they were aware of Philidor's deceptive practices. Pearson repeatedly spoke of the purported benefits of the AF strategy during the relevant period but refused to provide details of the particular practices when asked.

149. In addition, when Valeant's relationship with Philidor was uncovered, Pearson admitted that it was a conscious decision to conceal Philidor for purported "competitive" reasons.

150. When Citron issued its report questioning whether Valeant was inflating revenue through Philidor, Pearson and Carro publicly defended Valeant's accounting. However, once the SEC investigation was underway, Carro and Schiller were asked to leave for engaging in "improper conduct" related to the accounting. Valeant admitted it had improperly inflated revenues through Philidor and would need to restate its previously issued financial statements.

151. Finally, the efforts by Philidor to cover up its wrongdoing further support an inference of scienter considering Valeant's effective control over Philidor. Specifically, as reported by *Reuters*, starting in September 2015, "Philidor began requiring employees to sign confidentiality agreements empowering the pharmacy to sue workers who divulged information about its activities." As Philidor has admitted, with Valeant as Philidor's only client, the confidentiality requirements benefited Valeant and supported the Defendants'

scheme by restricting disclosures regarding Philidor's connection with Valeant and its role in the scheme.

### C.     Valeant's Refusal to Pursue Remedies Against Wrongdoers

152.    Valeant's failure to pursue remedies against Philidor and Philidor executives, and Valeant employees who worked with Philidor, supports an inference that the deceptive business practices alleged herein were fully approved by senior executives at Valeant. Valeant, therefore, could not pursue such remedies for the very wrongdoing it condoned, and thus was limited to terminating the employment of the wrongdoers and shutting down Philidor.

153.    Notably, Valeant's purchase option agreement with Philidor provides broad indemnification rights to the Company, including that Philidor "shall indemnify, defend, and hold harmless" Valeant "from and against any and all Losses" to Valeant "as a result of the operation of the Pharmacy or the performance by the Pharmacy of its duties." However, the purchase option agreement further provides that such liability "shall be reduced by the extent . . . that such Losses are caused by or arise out of (a) the negligence or intentional misconduct of Manufacturer." Rather than pursue its claims against Philidor, Valeant entered into a mutual release with Philidor, effective as of November 1, 2015.

### D.     Valeant's Admissions of Material Weaknesses in Internal Controls and Financial Reporting

154.    As detailed above, Valeant has admitted that several of Defendants' statements were false and misleading, that Carro and Schiller engaged in improper conduct, and that Valeant had an unethical "tone at the top" led by Pearson.

155.    On February 3, 2016, Valeant admitted that Pearson's April 29, 2015 statement that "volume was greater than price in terms of our growth" was false. On

February 22, 2016, Valeant issued a press release wherein the Company stated it had improperly recognized revenues. On March 21, 2016, the Company issued a press release and Form 8-K disclosing that it had material weaknesses in internal controls and the 2014 Form 10-K and three Form 10-Qs during 2015 could no longer be relied upon.

156.    Further, Schiller was accused of "improper conduct" and the Company "determined that the tone at the top of the organization and the performance-based environment . . . may have been contributing factors resulting in improper revenue recognition. Valeant asked Schiller to resign from the Board of Directors and forced Pearson and Carro out, quickly replacing them.

### E.    Defendants' Admissions During the Congressional Hearings

157.    Congressional committees began investigating Valeant's business practices in 2015. Numerous admissions during the course of these investigations further support an inference of scienter.

#### House Oversight Committee Hearing

158.    Valeant produced 75,000 pages of documents to the House Oversight Committee. A summary of those documents corroborates the allegations herein confirming: (i) "Valeant identified goals for revenues first, and then set drug prices to reach those goals," (ii) "Valeant used its patient assistance programs to justify raising prices and to generate increased revenues by driving patients into closed distribution systems," and (iii) Valeant "sought to exploit this temporary monopoly by increasing prices dramatically to extremely high levels very quickly."

159.    During the February 4, 2016 hearing, Schiller demonstrated his intimate familiarity with and knowledge of Valeant's drug pricing practices and spoke as an

authority on the subject. Schiller further acknowledged that federal anti-kickback laws prohibited the "patient assistance" programs Valeant provided.

160.    In live testimony at the hearing, Schiller admitted that the previously concealed risks of the Company's pricing practices included: "increased pressure for rebates from the payers, decreased sales volumes from hospitals, increased substitution of alternative products, and heightened competition from new generic or branded drugs."

161.    In addition, Schiller effectively admitted that Valeant's business strategy was neither sustainable nor more profitable, a notion which Defendants previously denied repeatedly during the relevant period. Schiller did so by acknowledging "we made a lot of mistakes" and would no longer pursue such "aggressive" price increases and would be lowering prices.

<u>Senate Aging Committee Hearing</u>

162.    On April 27, 2016, the Senate Aging Committee held hearings related to Valeant.

163.    Pearson (who had been terminated as CEO after returning from a leave of absence) along with Schiller and Ackman testified.

164.    Pearson admitted during the hearing: "Yes. Our pricing has driven more growth than volume, although that is changing over time." He also stated "we have also made mistakes, including those that bring me here today."

165.    Senator McCaskill commented that "[e]ven Valeant's patient assistance program appears to be set up solely to increase Valeant's bottom line," with Senator Collins adding that Valeant's PAP was used "so that you can still get the payments primarily from commercial insurers, which dwarf the amount that you're giving in customer assistance."

- 54 -

166.     Senator Warren asked Pearson "[w]hy don't you use these co-pay reduction programs for federal government insurance programs, like Medicare Part D or Medicaid," to which Pearson acknowledged "we're not allowed to." Warren responded, "Yeah, because it's illegal."

167.     She additionally stated: "These programs are illegal because Medicare and Medicaid understand that the programs are scams to hide the true cost of the products from the consumer and drive up the cost of all the taxpayers."

168.     Finally, in connection with the Congressional probes, Philidor was asked why Valeant did not simply purchase Philidor outright rather than acquire the option to purchase it for $0. Philidor's counsel, in a written response, said that "Philidor concluded that Valeant's conduct was consistent with a concern about the economic impacts of any PBM response if Valeant had purchased Philidor." Thus, Philidor confirmed that Valeant knew PBMs would refuse to reimburse Philidor prescriptions if PBMs knew of the controlling relationship.

## F.     Executive Departures

169.     Widespread executive and director departures, including many of the Individual Defendants, in close temporal proximity to revelations regarding the deceptive practices by Valeant and Philidor, further support an inference of scienter.

170.     On April 29, 2015, just a few months before the scandal would reach the public and just after the false 2014 financial statements were issued, Valeant announced that Schiller would be leaving his position as CFO once a successor was appointed.

171.     Kornwasser left the Company in July 2015. CNBC subsequently attempted to contact Kornwasser, but received a call from Valeant's crisis management department

who said Kornwasser was not interested in discussing Valeant or Philidor. Representative Cummings noted Kornwasser was never made available when the House Oversight Committee asked Valeant to produce him for an interview.

172.    On or about March 2, 2016, it was reported that Deborah Jorn, head of the U.S. Gastrointestinal and Dermatology divisions was "leaving the company effective immediately." Jorn was responsible for some of Valeant's top selling drugs, including Jublia, a dermatology drug which was sold in massive quantities through Philidor.

173.    On March 21, 2016, Valeant issued a press release regarding the restatement and material weaknesses of its internal controls. It also confirmed Pearson would be leaving the Company. Moreover, the Company admitted that Schiller and Carro engaged in "improper conduct" and provided inaccurate information to the ad hoc committee of the Board of Directors investigating the false revenues. Schiller was asked to resign from the Board. Carro was replaced as Controller.

174.    After joining the Board of Directors, Ackman was asked by media and Congress about the corrective actions Valeant was taking and he responded by stating that Pearson was replaced as CEO. Ackman responded that "[w]e have a new CEO starting" and a "lot of the board is going to turn over, so we're going to have a new board for the most part."

175.    On April 29, 2016, Valeant announced that seven of its board members would not be standing for re-election. This included Pearson and Schiller, as well as Mason Morfit (of ValueAct), Provencio (chair of the Audit Committee), Goggins, Farmer, and Melas-Kyriazi (member of the Audit Committee). Notably, Provencio, Goggins, and Morfit were also members of the Ad Hoc Committee.

### G.     Valeant's Unusual Executive Compensation Structure

176.    Valeant's unusual compensation structure provided incredibly rich compensation packages based on achieving increasingly challenging performance goals, backed by the threat of termination. This emphasis on results over ethics led to a culture of fraudulent practices.

177.    For example, at a May 28, 2014 conference, Pearson stated "there's been a lot of turnover at the senior ranks; but that has been, by and large, our decision, not their decisions, as we continue to upgrade talent." Pearson bluntly acknowledged "[t]here's no tenure at Valeant. It's up and out. . . . It's more like a professional services firm than a sort of traditional pharmaceutical company." Pearson also admitted that the compensation system at Valeant was entirely dependent on increasing the stock price, stating:

> So, our Company senior management and the Board – we – there's only one metric that really counts, and it's total return to shareholders. That's how we're paid. We have a unique pay model, that at least we – at least – if we don't at least achieve a 15% total return to shareholders each year, compounded annual growth rate, that basically the equity we receive in terms of our stock grabs is worth nothing.

178.    Valeant's highest-ranking executives received millions of dollars for achieving the increasingly aggressive financial targets. For example, in 2014, Pearson's base compensation was $2 million and Schiller's was $1 million. However, under the bonus program they could earn multiples of their base salary. For example, Pearson received an $8 million bonus, an amount equal to four times Pearson's base compensation, and Schiller received a $2.4 million bonus.

179.    The lavish salaries and bonuses paled in comparison to the rewards for bringing Valeant's stock price as high as possible until 2017. Industry observers noted that Valeant's compensation scheme paid Pearson "like a hedge fund manager." For example,

on April 22, 2014, the Company filed a proxy statement with the SEC disclosing that the value of Pearson's shares on March 31, 2014 was approximately $1.3 billion. During an April 22, 2014 presentation in New York, Ackman appeared with Pearson and referred to the $1.3 billion, stating that "this is one of the more unusual and leveraged shareholder aligned compensation packages we've ever seen." Ackman also highlighted that a large portion of Pearson's compensation was tied to the grant of performance share units that vest only if he delivered incredibly aggressive annual returns over three years of between 15% and 60%, which compounded each successive year.

180.    The compensation program provided Pearson the opportunity to become a billionaire and obtain wealth far beyond even a typical highly paid CEO. It also incentivized Pearson and other Valeant executives to use any means necessary to increase the stock price through 2017 at the expense of the long-term health of the Company and shareholder interests.

181.    Moreover, Pearson was allowed to effectively cash out a portion of his stock, pledging it as collateral for $100 million loaned to him by Goldman Sachs in 2014.

182.    With such powerful incentives, Pearson made statements to drive up the stock price, including in an October 27, 2014 letter Pearson wrote to Allergan's Board of Directors, which was publicly disclosed by the Company. In it, Pearson stated: "We believe our stock is trading at artificially low levels."

183.    On January 13, 2015, the Company filed a Form 8-K with the SEC announcing it had entered into an amended and restated employment agreement with Pearson. Pearson stopped earning an annual base salary, but his "target bonus opportunity" was increased from $6 million to $10 million. Again, as large as it was, the cash bonus

paled in comparison to the hundreds of millions of dollars in compensation Pearson would receive if he successfully drove Valeant's share price higher.

184.    Schiller also had millions of dollars of his executive compensation connected with meeting challenging share price increase. On top of their extreme compensation, Pearson and Schiller were permitted personal use of Valeant's $60 million fleet of private jets which were used by them to fly friends and family for vacations.

185.    On March 21, 2016, the Company admitted that its aggressive compensation and performance goal practices contributed to the wrongdoing stating: "the Company has determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition" and other misconduct detailed in the press release.

186.    The material weakness in internal controls further supports an inference of scienter as accounting and internal control guidance makes clear the importance "top management" has setting an appropriate tone. (SEC Staff Accounting Bulletin No. 99 at 16). As CEO, Pearson had ultimate responsibility for Valeant's internal control system and setting the "tone at the top" to prioritize ethical business and accounting practices and compliance over personal financial compensation, which he failed to do. As the COSO Framework states, "[t]he influence of the CEO on an entire organization cannot be overstated." (COSO Framework at 84).

### H.    Defendants Inflate Valeant's Stock Price to Facilitate Acquisitions

187.    In addition to personal compensation, the Individual Defendants had motive to conceal their fraudulent business practices described herein in order to artificially inflate Valeant's stock price to more cheaply acquire other companies and further its acquisition strategy.

188.    For example, in 2014, Valeant offered cash and shares of Valeant stock in exchange for Allergan shares of stock. Thus, Defendants had an incentive to increase the price of Valeant shares to hit or exceed their $46 billion offer to Allergan, which was to be substantially funded with Valeant shares. On May 28 and 29, 2014, Valeant held meetings with some of Allergan's largest shareholders to gather their support for Valeant's bid. Ackman reported that Allergan's shareholders would support the transaction if Valeant could "deliver $180 a share in Valeant in the value of the bid." The higher Valeant's stock price, the lower the cash required to deliver $180 per Allergan share.

189.    Valeant also took advantage of the artificially inflated price of its securities to conduct numerous debt and equity offerings during the relevant period, including one of the largest high-yield debt offerings in history, which generated in the aggregate nearly $15 billion of cash for the Company from the investing public at artificially inflated prices. For example, Valeant used proceeds from a $9.5 billion offering of senior notes in March 2015 to acquire Salix, and proceeds from a $3.2 billion offering of senior notes in July 2013 to acquire Bausch & Lomb.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

190.    This case concerns Plaintiff's sales of put options on and purchases of Valeant common shares beginning in October 2015. Plaintiff specifically read (and/or

listened to) and relied upon the false and misleading statements alleged herein, which include the false and misleading statements contained in: (i) Valeant's annual, quarterly, current, and special reports filed with and/or furnished to the SEC; and (ii) Valeant's presentations and conference calls with analysts and investors. Plaintiff specifically read and relied upon Defendants' false and misleading statements pertaining to, among other things, the Company's pharmaceuticals sales practices, including the propriety of Philidor, internal controls and operational condition.

191.    Plaintiff, through their investment manager, Okumus Fund Management, Ltd., reviewed, read, heard, and relied upon Defendants' false and misleading statements prior to purchasing Valeant shares.

192.    Defendants' false and misleading statements impacted Plaintiff's decision to write Valeant puts and purchase Valeant shares because Defendants' statements falsely assured Plaintiff that Valeant, among other things, maintained effective internal controls, properly conducted pharmaceuticals sales, and did not employ a clandestine network of captive pharmacies to sell its branded drugs. Had Plaintiff been provided a truthful account of Valeant's underlying business activities, Plaintiff would not have engaged in the transactions in Valeant securities that are the subject of this case.

193.    The publicly available false and misleading statements set forth herein were widely disseminated to the securities markets, investment analysts, and to the investing public. Those statements caused and maintained the artificial inflation of the price of Valeant common stock, and impacted the price of Valeant put options, which consequently traded at prices in excess of its true value.

194.    Plaintiff is also entitled to the presumption of reliance established by the fraud-on-the-market doctrine. At all times relevant to this Complaint, the market for Valeant common stock was an efficient market. Valeant common stock and options were actively traded on a highly efficient and automated market. Valeant filed periodic public reports with the SEC and was followed by numerous securities analysts employed by leading brokerage firms and investment banks that wrote reports about the Company. Valeant regularly issued press releases, which were carried by national and international news wires, and which were publicly available and entered into the public marketplace. As a result, and which is empirically evident, the market for Valeant equity securities promptly digested current information regarding Valeant from all publicly available sources and reflected such information in the Valeant common stock and option prices.

195.    In addition, Plaintiff is entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market concerning Valeant's inadequate internal controls, financial reporting and undisclosed business practices concerning, among other things, Valeant's relationship with Philidor.

196.    On February 22, 2015, Valeant issued a press release announcing its fourth quarter 2014 ("4Q14") and full year 2014 financial results. For 4Q14, the release reported "Revenue [of] $2.3 billion . . . GAAP EPS [of] $1.56, [and] Cash EPS [of] $2.58." For the full year 2014, the press release reported: "Revenue [of] $8.3 billion . . . GAAP EPS [of] $2.67, [and] Cash EPS [of] $8.34, (excluding Allergan gain)." The release also reported 4Q14 net income of $534.9 million and 2014 net income of $913.5 million. The press release further reported that "Total Same Store Sales organic growth" was 16% and 13%

for the 4Q14 and fiscal year 2014 ("FY 2014"), respectively and quoted Pearson as claiming Valeant's strategy "is paying off for all of our stakeholders" and reporting "*Outstanding growth in the U.S., most notably dermatology*."

197.   On February 23, 2015, Pearson and Schiller hosted a conference call to discuss Valeant's 4Q14 and full year 2014 financial results. During the call, Schiller highlighted Valeant's sources of growth, including that "[r]evenues for our dermatology business were very strong and increased 70% year-over-year" and:

> The outstanding work of our sales teams, implementation of innovative marketing approaches, great leadership, a portfolio of great products, and our four new launch products have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014.
>
> Core products such as Zyclara, Elidel, and the RAM franchise continued their strong growth. And Solodyn grew in Q4 and grew 5% for all of 2014, after a tough year in 2013.
>
> Jublia continues its rapid growth trajectory and reported more than 20,000 weekly scripts for the last reported weekly sales report. This yields an annualized run rate of greater than $250 million for the product.

198.   On February 25, 2015, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2014 ("2014 10-K"). The 2014 10-K was signed by Defendants Pearson and Schiller, and the relevant third parties. The 2014 10-K:

(a)   reported the Company's 4Q14 revenue of $2.28 billion, net income of $534.9 million, GAAP EPS of $1.56, full year 2014 revenues of $8.264 billion, net income of $913.5 million, and GAAP EPS of $2.67;

(b)   attributed the source of Valeant's growth to "our lower risk, output-focused research and development model, which allows us to advance certain development

programs to drive future commercial growth, while minimizing our research and development expense";

(c)     claimed "[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care.";

(d)     stated that "[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary," while omitting any mention of Philidor;

(e)     stated, under the heading "Business Combinations":

*During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate. These acquisitions are included in the aggregated amounts presented below*;

(f)     included "Reports of Management on Financial Statements and Internal Control over Financial Reporting" signed by Pearson and Schiller, stating:

**Financial Statements**

The Company's management is responsible for preparing the accompanying consolidated financial statements in conformity with United States generally accepted accounting principles ("U.S. GAAP"). In preparing these consolidated financial statements, management selects appropriate accounting policies and uses its judgment and best estimates to report events and transactions as they occur. *Management has determined such amounts on a reasonable basis in order to ensure that the consolidated financial statements are presented fairly, in all material respects. Financial information included throughout this Annual Report is prepared on a basis consistent with that of the accompanying consolidated financial statements.*

**Internal Control Over Financial Reporting**

- 64 -

Under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based on the framework described in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Based on its evaluation under this framework, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2014*;

(g)     represented that "*pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control*"; and

(h)     also included the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, as required by the SEC, which stated, among other things, that the Form 10-K did not contain any untrue statement of material fact or omit to state a material fact.

199.     Plaintiff read and relied upon the statements in ¶¶196-198 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's February 22, 2015 press release, the February 23, 2015 conference call, and the 2014 10-K were false and misleading when made for the reasons set forth in §§IV and VI. In particular, Defendants' statements were false and misleading because:

(a)     Philidor was formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant-branded pharmaceutical products and to avoid substitution of Valeant drugs with competing products; Valeant employees worked at Philidor; Valeant was Philidor's only client and had the ability to shutter its business; Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0; Valeant was consolidating Philidor's results as its own, and had obtained explicit rights to direct

Philidor's activities; and that these facts were being concealed by Valeant from private payors, patients, physicians, PBMs, and investors;

(b)     Valeant's business strategy relied on a host of deceptive practices and a material source of the Company's growth, including its organic growth, in revenues and sales of its key dermatology, neurology and other products resulted from these practices. The deceptive practices included, among other things, improperly waiving co-pays, altering prescriptions, submitting insurance claims with false information, improperly automatically refilling prescriptions, and other similarly conduct aimed at getting around legitimate measures taken by TPPs and PBMs to keep drug costs down;

(c)     Valeant's business risks materially increased as a result of these undisclosed practices. The increased risks included government investigations, regulatory sanctions, criminal charges, reputational harm, contractual violations, decreased sales, and increased scrutiny, as well as alienation of PBMs, private payors, and physicians if such practices became known;

(d)     Valeant's reported revenues, EPS, profitability, and future business prospects were dependent on the Company's ability to continue to conceal these deceptive practices and did not accurately portray Valeant's financial performance and business prospects due to the associated risks;

(e)     The Company's growth and ability to service its debt were dependent on acquiring companies and drug portfolios in which it could dramatically increase prices and engage in the deceptive practices and any slow-down or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(f)     Valeant was not employing a "lower risk, output-focused research and development model," but employing a strategy that subjected Valeant to enormous risk;

(g)     Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not have, or had been denied, a license;

(h)     Even though Valeant's branded products were subject to competition with more cost-efficient drugs and generics that were preferred by PBMs and substituted by pharmacies, deceptive practices allowed Valeant to avoid such substitution;

(i)     Valeant improperly recognized Philidor revenue, in violation of GAAP, causing revenues, net income, and EPS to be materially misstated and inflated, and the Company failed to disclose Philidor as a variable interest entity ("VIE") as it was required to, as set forth in ¶¶252-269;

(j)     Valeant lacked adequate internal controls, compliance and training programs which resulted in an "improper tone at the top," with Defendants prioritizing increasing Valeant's stock price and/or their own compensation over ensuring that Valeant and its undercover network of pharmacies complied with applicable laws, regulations, contracts, and ensured that its SEC filings and public disclosures were free of material misstatements; and

(k)     Valeant's senior management reviewed and approved the improper accounting which reflected a material weakness in internal controls.

200.     On April 29, 2015, the Company issued a press release announcing its financial results for the first quarter 2015 ("1Q15"), as well as increased guidance for full year 2015. The release reported: "Same Store Sales Organic Growth was 15%, driven by":

Growth from launch brands, including BioTrue Multipurpose Solution, BioTrue ONEday Contact Lens, Jublia, Luzu, and Ultra Contact Lens, and

Double digit growth in U.S. businesses such as Contact Lens, Dermatology, Neurology and Other, Obagi, and Oral Health[.]

201.    On April 29, 2015, Pearson, Schiller and Kellen hosted a conference call to discuss Valeant's 1Q15 financial results with investors and analysts. During the call:

(a)    Pearson stated, in part:

Our US dermatology business had an outstanding quarter. Dermatology revenue grew 38% year on year and script growth grew 37% year on year. Jublia scripts grew 87% in Q1 versus Q4 of last year; grew 87% in Q1 versus Q4 of last year; and

(b)    An analyst asked "if you could quantify a little bit how much was price versus volume that contributed to growth in 1Q? And what do you factor in your full-year guidance price versus volume?" Pearson responded:

***In terms of price volume, actually volume was greater than price in terms of our growth. Outside the United States it's all volume . . . . And in the US it's shifting more to volume than price, and we expect that to continue with our launch brands.*** A lot of our prices for most of our products are negotiated with managed care. And there's only a limited amount of price that we can take.

202.    On April 30, 2015, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2015 ("1Q15 10-Q"). The 1Q15 10-Q was signed by Pearson and Schiller and: (a) reported the Company's 1Q15 revenue of $2.191 billion; (b) included a statement related to Valeant's "Business Combinations", which failed to mention the existence of Philidor as a VIE; and (c) included the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller.

203.   The 1Q15 10-Q also included a statement regarding the Company's purportedly lower risk business strategy, stating:

> *The growth of our business is further augmented through our lower risk, output focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense. We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.*

204.   The 1Q15 10-Q represented that "pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control" while concealing that Valeant controlled and had significant influence over Philidor.

205.   Plaintiff read and relied upon the statements in ¶¶200-204 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's April 29, 2015 press release and conference call, and 1Q15 10-Q, were false and misleading when made for the reasons set forth in §§IV and VI, and ¶199. In particular, Defendants' statements were false and misleading because: (i) the US dermatology group's purported "outstanding quarter" and rapid growth in Jublia sales was driven by the undisclosed and improper practices at Philidor; (ii) it was a material omission to assert that "volume was greater than price in terms of [Valeant's] growth" without disclosing that both volume and growth were being driven through the use of improper practices by Valeant's secret captive pharmacy network; and (iii) Defendants failed to reveal the Company did a substantial amount of business with a related entity (Philidor) that it effectively purchased and controlled, but held to the public as an independent third party.

206.   On May 19, 2015, Pearson addressed investors at Valeant's 2015 annual shareholder meeting. Pearson made numerous statements about the business strategy, source of growth, pricing, and stock price including:

(a)   Pearson said that "we have a differentiated R&D model that has and will continue to deliver more innovative products to our customers at a lower cost than our competitors" adding that "[w]e've delivered three consecutive strong quarters of organic growth, 19% and 16% and 15% respectively"; and

(b)   Valeant had a "unique executive compensation system tied to generating disproportionate returns for our shareholders."

207.   On May 21, 2015, Pearson attended an RBC Capital Markets, LLC ("RBC") Investor Meeting on Valeant's behalf.  Pearson reassured investors "*our accounting practices are fine*" and added "[w]e get audited all the time, by the SEC . . . and we have absolutely no issue from a government standpoint" and that "*we never had a financial irregularity*."

208.   Plaintiff read and relied upon the statements in ¶¶206-207 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's annual shareholder meeting and the RBC Capital Markets Investor Meeting were false and misleading when made for the reasons set forth in §§IV and VI, and ¶¶199, 205. In particular, Defendants' statements were false and misleading because: (i) Valeant's low-cost R&D model was not providing drugs to customers at a competitive price or contributing to the Company's strong organic growth, which was being generated by the deceptive practices detailed herein; (ii) Valeant's "unique executive compensation system" had incentivized Defendants to drive up short term profits through improper business

practices that put the Company at great risk in the long-term; (iii) the Company's accounting was not "fine," but rather were falsely deriving profits and revenue from Philidor.

209.     On July 23, 2015, the Company issued a press release announcing its second quarter 2015 ("2Q15") financial results and increasing the Company's full year 2015 guidance. The release reported that "Same Store Sales Organic Growth was 19%, driven by: U.S. businesses, driven by the strength of dermatology, contact lenses, dental and Obagi."

210.     The July 23, 2015 press release also quoted Pearson as stating: "We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15% *organic growth. Our strong second quarter results were driven by outperformance in our U.S. businesses.*"

211.     On July 23, 2015, the Company also hosted a conference call to discuss its 2Q15 financial results. Pearson, Rosiello, and Kellen attended on Valeant's behalf. Commenting on the Company's results, Pearson stated, in relevant part:

> We have now delivered four consecutive quarters of more than 15% same-store organic growth. Strong performance throughout our businesses resulted in both our top and bottom line exceeding the Q2 guidance that we provided on our last call.
>
> * * *
>
> Turning to organic growth, our overall same-store total company organic growth was 19% for the quarter. The exceptional growth of our US businesses driven by the strength of dermatology, contact lenses, dental and Obagi was complimented by many of our emerging markets including China, Middle East/North Africa, Russia and South Korea.
>
> * * *

Jublia is now our second largest product with annual run-rates sales of approximately $450 million. . . . Our US dermatology business had another excellent quarter with our launch brands leading the way. Both launch and core brands contributed to the dermatology revenue growth of 55% year-on-year. Jublia scripts grew 37% in Q2 versus Q1 . . . .

212.   During the question and answer session of the Company's July 23, 2015 conference call, a Jefferies LLC analyst questioned whether the number of prescriptions for Jublia going through specialty pharmacy channels had improved. In response, Kellen, Valeant's Company Group Chairman, concealed Valeant's control over the Philidor network, and stated:

> **Yes, the adoption through multiple specialty pharmacies continues**. I think last time we said Jublia was around 50%. That trend continues. For derm[atology] overall, it varies by product, but it's around 40%.

213.   On July 28, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for its 2Q15, ended June 30, 2015 ("2Q15 10-Q"). The 2Q15 10-Q was signed by Pearson and Rosiello. The 2Q15 10-Q **reported the Company's revenues for the six months ended June 30, 2015 of $4.923 billion**. The 2Q15 10-Q also stated:

> **As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions** in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . **Provisions as a percentage of gross sales increased to 32% and 33% for the second quarter and first half of 2015**, respectively, compared with 27% and 26% in the second quarter and first half of 2014. **The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere 0.08% ("RAM 0.08%")** . . . .

- 72 -

214. The 2Q15 10-Q also included a statement regarding the Company's purportedly lower risk business strategy, stating:

> *The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.*

215. The 2Q15 10-Q represented that "*pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control*" while concealing that Valeant effectively purchased, controlled and had significant influence over Philidor.

216. Plaintiff read and relied upon the statements in ¶¶209-215 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's July 23, 2015 press release and conference call and the 2Q15 10-Q, were false and misleading when made for the reasons set forth in §§IV and VI, and ¶¶199, 205, 208. In particular, Defendants' statements were false and misleading because: (i) it was a material omission to draw attention to Valeant's 19% "organic growth" as driven by "strength of dermatology" and "outperformance in our U.S. business" without also disclosing that a material portion of these sales were made through deceptive practices perpetrated by Valeant's secret captive pharmaceutical network and put the Company at great risk; (ii) it was a material omission to draw attention to the excellent Jublia sales of $450 million, without noting that a very significant portion of these sales went through Philidor and were made possible by improper business practices; and (iii) Valeant's business model was not "lower risk" but was, in fact, extraordinarily high risk as a result of Valeant's use of

deceptive business practices that jeopardized the Company's relationships with vital constituencies including doctors, regulators, PPMs, and TPPs.

217. On September 28, 2015, Valeant filed a Form 8-K with the SEC that attached a letter from Pearson to the Company's employees responding to claims that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement." In his letter:

(a) Pearson referred to these concerns as a "bear thesis," claimed they were "*incorrect on both accounts*," and dismissed the dependency on price increases stating "*Valeant is well-positioned for strong organic growth, even assuming little to no price increases*";

(b) Pearson added, "[a]s we have stated many times, *Valeant's core operating principles include a focus on volume growth* and a concentration on private and cash pay markets that avoid government reimbursement in the U.S." and "the majority of our portfolio *will continue to deliver strong volume-based organic growth and is not dependent on price increases*";

(c) Pearson went on to "lay out the facts" noting, in part, that: (i) growth in dermatology, ophthalmology, Rx and dentistry was based on having "*delivered over 30% script growth year to date*," and (ii) they expected "*double-digit script growth and corresponding* revenue growth trends to continue" in the "Salix business"; and

(d) Pearson added, "*we expect double-digit organic growth in 2016 and beyond as we prepare for the launch of Addyi and anticipate other potential product approvals* . . ."

218.     Plaintiff read and relied upon the statements in ¶217 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's September 28, 2015 Form 8-K, were false and misleading when made for the reasons set forth in §§IV and VI, and ¶¶199, 205, 208, 216. In particular, Defendants' statements were false and misleading because: (i) Valeant was not "well-positioned for strong organic growth" since the Company's growth had been dependent upon improper business practices as detailed herein; (ii) Valeant's growth had been dependent on price increases more than Defendant Pearson suggested; (iii) Valeant's "30% script growth" had only been made possible through the use of deceptive and improper business practices through Valeant's secret captive pharmacy network; and (iv) expectations of "double-digit organic growth in 2016 and beyond" were only possible if Valeant could continue to perpetrate a highly risky scheme that deceived TPPs and PBMs and violated Valeant's contractual obligations.

219.     On October 14, 2015, Valeant issued a press release noting it received subpoenas from the Department of Justice ("DOJ") for documents regarding its patient assistance and distribution practices. The release quoted Pearson as stating that "*All of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner*."

220.     Plaintiff read and relied upon the statements in ¶219 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's October 14, 2015 press release were false and misleading when made for the reasons set forth in §§IV and VI, and ¶¶199, 205, 208, 216, 218. In particular, Defendants' statements were false and misleading because: (i) Valeant did not have strong regulator and financial

controls, but rather had inadequate internal controls; and (ii) Valeant did not operate in business in compliance with its contractual or legal obligations.

221.    On October 19, 2015, Valeant issued a press release announcing its 3Q15 financial results and hosted an earnings conference call that began before the market opened. The release stated, in part, "Same store sales organic growth of 13%; 5th consecutive quarter of > 10% organic growth, driven by: Continued outperformance of U.S. businesses, particularly dermatology and contact lens . . . ."

222.    As discussed in ¶72, Valeant's ties to Philidor were beginning to be uncovered by investigative journalists, which forced Valeant to publicly disclose the relationship. To offset the negative impact on the price of Valeant securities, the Company raised revenue and EPS guidance for the fourth quarter 2015 ("4Q15") and full year 2015. In addition, the press release quoted Pearson as stating, in part, "***With our strong product portfolio and growth prospects, we feel very confident in our future outlook and we are reaffirming our $7.5 billion EBITDA floor for 2016***."

223.    That same day, Pearson, Rosiello, and Kellen hosted a conference call. In the slide presentation accompanying the earnings conference call, Valeant included a list of anticipated "Questions from Investors." One of the "anticipated" questions was "How does Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor" to which the presentation noted:

> ***We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages[.]***
>
> Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed ***through multiple specialty pharmacies[.]***

*We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients[.]*

*We understand that Philidor*:

Provides services under our programs for commercially insured and cash paying claims only. Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs[.]

*Does not restrict prescriptions it fills to any particular manufacturers (including Valeant)[.]*

*Dispenses generic products as specified in patient's prescription or as requested by patient[.]*

224.    During the call, Pearson repeated some of the same claims, saying that the relationship with Philidor had not been disclosed previously for "competitive reasons" and suggesting Valeant's use of specialty pharmacies was similar to its competitors and resulted in more affordable prices, stating, in part:

*The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors. But given all the incorrect assertions* by some, we will provide an update to this call. *Similar to many pharmaceutical companies in the US, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies. We find specialty pharmacies improve patients' access to medicines at an affordable price, and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients. In almost all cases, our inventory with specialty pharmacies in this channel and the title to our* medicine only transfers to the pharmacy when the actual prescription is filled.

225.    Pearson also claimed that *"[s]ince we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled, this consolidation has*

- 77 -

*the impact of delaying revenue recognition as compared to products that are sold through traditional distribution channels*."

226.     Regarding the lawsuit filed by R&O, Pearson reassured investors that the business practices of Valeant and Philidor were proper by claiming:

> *R&O is one of the specialty pharmacies in our network*, and Valeant has shipped approximately $69 million at wholesale prices to them. This represents approximately $25 million at net prices. Any products R&O dispensed to patients were recognized as our revenues, and are reflected in our receivables. Any products still held by R&O are reflected in our inventory. *R&O is currently improperly holding significant amounts it receives from payers*. We will refrain from comment on active litigation, and *look forward to showing in court that we are owed the money*.

227.     During the conference call, Rosiello repeated the increased guidance from the press release, and added that "*[w]e expect our gross margins to approach 80% in the fourth quarter, driven by continued growth in our dermatology and Salix businesses, the launch of Addyi*, and decreased sales of Xenazine."

228.     To further alleviate investor concern, and buoy the price of Valeant's securities, the slide presentation also stated that Valeant was "*reaffirming our expectations to exceed $7.5 [billion] in EBITDA in 2016*." When Pearson was asked during the conference call how the lack of price increases going forward may affect the Company's ability to meet EBITDA guidance in 2016, he responded, in part, "*today . . . we feel very comfortable with the $7.5 billion and we expect our guidance next year will exceed that*."

229.     Plaintiff read and relied upon the statements in ¶¶221-228 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's October 19, 2015 press release and conference call were false and misleading when made for the reasons set forth in §§IV and VI, and ¶¶199, 205, 208, 216, 218. In particular,

Defendants' statements were false and misleading because: (i) Defendants could not plausibly claim to be "very confident in our future outlook" to achieve $7.5 billion EBITDA in 2016 without the continuation of the Company's improper business practices that put Valeant at great risk of damaging relationships with TPPs, PBMs, doctors and regulators, as detailed herein, and which did in fact occur and caused the Company to repeatedly revise downward EBITDA guidance shortly after this statement was made; (ii) Valeant did not utilize Philidor and other specialty pharmacies to "improve patients' access" or "help . . . physicians" but to get around price-increase safeguard implemented by TPPs and PBMs; (iii) Valeant's specialty pharmacies did not dispense "generic products as written;" (iv) Valeant's specialty pharmacies were, in fact, restricted to serving Valeant; (v) Defendants' explanation for not revealing Philidor previously – to preserve "a competitive advantage that we did not want to disclose to our competitors" – was mere pretext, as Valeant did not disclose Philidor because doing so would cause TPPs and PBMs to investigate and shut down Valeant and Philidor's improper and deceptive practices; (vi) Defendants could not reasonably be "very comfortable" with the 2016 guidance in light of the fact that so much of Valeant's business was made possible by the improper and deceptive practices conducted by Valeant through Philidor, and which jeopardized Valeant's critical relationships with TPPs and PBMs among others.

230.    On October 21, 2015, Valeant issued a press release responding "to recent accusations made regarding its financial reporting and operations" by Citron Research ("Citron") that Valeant was inflating revenues through its secret network of pharmacies to refute such allegations and confirm it was complying with GAAP stating, in part:

*All shipments to Philidor and other pharmacies in the Philidor pharmacy network, including R&O, are not recorded in Valeant's consolidated net revenue. Sales are recorded only when the product is dispensed to the patient. All sales to Philidor and Philidor network pharmacies are accounted for as intercompany sales and are eliminated in consolidation. They are not included in the consolidated financial results that Valeant reports externally.*

Any inventory at pharmacies in the Philidor pharmacy network are included in Valeant's consolidated inventory balances – *there is no sales benefit from any inventory held at these specialty pharmacies* and inventory held at the Philidor network pharmacies is reflected in Valeant's reported inventory levels.

* * *

*The timing of our revenue recognition by selling through the Philidor pharmacy network is actually delayed when compared to selling through the traditional wholesaler channel.*

231.     Plaintiff read and relied upon the statements in ¶230 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's October 21, 2015 press release were false and misleading when made for the reasons set forth in §§IV and VI, and ¶¶199, 205, 208, 216, 218, 229. In particular, Defendants' statements were false and misleading because: (i) Valeant's accounting for transactions with Philidor did violate GAAP, as the Company has admitted in its restatement; and (ii) Defendants' enthusiastic assurances regarding the propriety of Valeant's accounting for transactions with Philidor ignored, and failed to disclose, that investors would obviously be interested in knowing about the many improprieties Valeant and Philidor engaged in to deceive TPPs and PBMs, as detailed herein.

232.     On October 26, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2015 ("3Q15 10-Q"). The 3Q15 10-Q

was signed by Pearson and Rosiello. The 3Q15 10-Q reported the Company's **revenue for the nine months ended September 30, 2015 of $7.71 billion**.

233.    The 3Q15 10-Q revealed that Valeant had the "power to direct Philidor's activities." The 3Q15 10-Q stated that the acquisition of Philidor had not been disclosed because it was deemed "not material." The 3Q15 10-Q stated: "During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, **which were not material individually or in the aggregate**." The 3Q15 10-Q report further stated:

> On October 26, 2015, the Company also announced that its **Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment. As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . Gross product sales for products dispensed through Philidor Rx Services, LLC** ("Philidor") pharmacy network (which is consolidated as a variable interest entity within our consolidated financial statements) **are recognized when a prescription is dispensed to a patient**. Net sales recognized through the Philidor pharmacy network represents 7% and 6% of our total consolidated net revenue for the three months and nine months ended September 30, 2015, respectively;

234.    The 3Q15 Form 10-Q also described the Company's performance:

> Excluding the items described above, we realized incremental product sales revenue from the remainder of the existing business of $236 million and $820 million in the third quarter and first nine months of 2015, respectively. **The growth, which incorporates sales directly to wholesalers and retailers as well as use of specialty pharmacies (primarily Philidor), reflected (1) higher sales of (i) Jublia®** (launched in mid-2014), (ii) the **Retin-A®** franchise (including the launch of RAM 0.08% in mid-2014), (iii) Xenazine®, (iv) Arestin®, (v) **Solodyn®**, and (vi) the Carac® franchise, and

(2) higher sales from other recent product launches, including the launches of Biotrue® ONEday, Bausch + Lomb Ultra®, and Onexton®;

235.    The 3Q15 10-Q included a statement regarding the Company's purportedly lower risk business strategy, stating:

> **The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense**[.]

236.    The 3Q15 Form 10-Q also revealed that Valeant had the "power to direct Philidor's activities."

237.    The 3Q15 Form 10-Q included the Internal Controls Statement and SOX Certifications (this time signed by Pearson and Rosiello).

238.    On October 26, 2015, Valeant also issued a press release designed to alleviate investor concerns and re-inflate the price of Valeant stock, which:

(a)    repeated that Valeant's "**Audit and Risk Committee and the full Board of Directors have reviewed the company's accounting for its Philidor arrangement and have confirmed the appropriateness of the company's related revenue recognition and accounting treatment**"; and

(b)    quoted Pearson as stating that "**as we have said previously, our accounting with respect to the Company's Philidor arrangements is fully compliant with the law,**" and "**we operate our business based on the highest standard of ethics, and we are committed to transparency**."

239.    Also on October 26, 2015, the Company hosted a conference call with investors that was accompanied by a presentation. Pearson, Schiller, Rosiello, Carro, and Kellen attended on behalf of Valeant. The presentation disclosed that "[o]ur specialty

pharmacy strategy originated from the Medicis Alternate Fulfillment Program." Among other things, the presentation also stated that:

(a)      "*Prescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail and other channels*";

(b)      "*We do not own or control Philidor*" and "*Philidor employees do not* report to report to Valeant";

(c)      "*Philidor is independent* . . . ."; and

(d)      "Unless and until Valeant exercises the option to acquire Philidor, *Philidor remains independent* and Valeant has no rights to remove CEO or management."

240.    Pearson assured investors there was no improper accounting or other improper practices involving Philidor stating:

(a)      "*we stand by our accounting treatment of Philidor completely*";

(b)      "*[w]e follow the law and we comply with accounting and disclosure rules*'';

(c)       "We still believe that the strategy of working with specialty pharmacies is sound and it's good for patients and physicians. *There have been no issues with regards to the accounting or revenue recognition of the business*''; and

(d)      "*We have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor*."

241.    Rosiello reinforced the statements by adding:

(a)      "*Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate*";

- 83 -

(b)     "*Valeant recognizes revenue only when products are dispensed to patients, and Valeant records this at net realized price*";

(c)     "*There is simply no way to stuff the channel of consolidated variable interest entities, or VIEs, since all inventory remains on Valeant's consolidated balance sheet* until dispensed to patients"; and

(d)     "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate. A purchase option agreement for Philidor was executed in December 2014."

242.    Carro, Valeant's Corporate Controller, also defended Valeant's accounting and lack of prior disclosure regarding Philidor. Specifically:

(a)     Carro claimed that, as of year-end 2014, "*Philidor is not considered to be material to Valeant's business for reporting purposes*" at the end of 2014 because the "GAAP requirement for disclosing sales to large customers is 10% of revenue" and in December 2014 Philidor's year-to-date net sales were $111 million; and

(b)     Carro claimed that for the first two quarters of 2015 "*Philidor was not specifically mentioned in our disclosures because it had not been material to the consolidated financial statements*," because "[i]t represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014."

243.    Schiller reassured investors that there was no evidence of wrongdoing by Pearson, stating "if I had any concerns whatsoever about Valeant or Mike, I would not have stayed on the Board. It's as simple as that. When we announced that I was leaving, and Mike and I had a bit of our lovefest, I don't want to repeat all the words but I meant them

in terms of Mike is professional, his ethics, his work ethic, his commitment to doing the right thing."

244.    Pearson also reaffirmed Valeant's recently increased 2015 guidance, stating: "*Given the continued healthy growth in dermatology, Salix, eye health, and the recent Addyi launch, we expect to meet or exceed our fourth-quarter projections*, excluding the one-time expenses associated with recent events." He added, "*we continue to be very comfortable with our 2016 EBITDA expectation of greater than $7.5* billion."

245.    Plaintiff read and relied upon the statements in ¶¶230-244 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's October 26, 2015 press release and conference call, and Form 10-Q filing, were false and misleading when made for the reasons set forth in §§IV and VI, and ¶¶199, 205, 208, 216, 218, 229, 245. In particular, Defendants' statements were false and misleading because: (i) Valeant's relationship with Philidor clearly was material to Valeant investors, in light of the significant risks this relationship imposed on Valeant; (ii) Valeant's accounting for its transactions with Philidor was not appropriate, as the Company has admitted in its restatement; (iii) the higher sales of Jublia and other drugs, particularly dermatology drugs, were generated through improper practices in violation of the Company's contractual obligations; (iv) Valeant did not "operate [its] business based on the highest standards of ethics" and was not "committed to transparency" but was rather employing deception and unethical conduct to increase sales and the prices for those sales; (v) Valeant did effectively "own" and "control Philidor"; (vi) Philidor was not truly "independent"; and (vii) Defendants could not reasonably "expect to meet or exceed [Valeant's] fourth-quarter projections" or be "very comfortable" with the 2016 guidance in light of the fact that so

much of Valeant's business was made possible by the improper and deceptive practices conducted by Valeant through Philidor, and which jeopardized Valeant's critical relationships with TPPs and PBMs among others.

246.   On November 10, 2015, before the market opened, Pearson, Rosiello, Carro, and Kellen hosted a conference call with investors to "update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you." Pearson stated, in relevant part:

> *We began working with Philidor because we believed a strong relationship with one specialty pharmacy would deliver better, faster customer service for doctors and patients. We were also looking for a pharmacy which would be willing to process prescriptions before adjudicating the claims, which would allow us rather than the patient, to assume the risk if the commercial payer denied the claim.*

247.   An analyst noted that there were "two kind[s] of major accusations aimed at the Company," one regarding pricing and the other regarding Philidor, and noted that Valeant "decided to limit your pricing going forward" and "cut operations with Philidor." Pearson stated, in relevant part:

> Well Philidor was very specific. *First, there was the Citron report which claimed financial fraud and other things. They quickly came out and there was no financial fraud, in terms of Valeant had to do.* But then other allegations were made in terms of the practices of Philidor. And we felt, both management and the Board felt that given these allegations, given what was happening to our stock price and given what many of our major shareholders were asking us to do that the best thing to do was to sever.

248.   Plaintiff read and relied upon the statements in ¶¶246-247 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's December 16, 2015 press release and conference call were false and misleading when made

for the reasons set forth in §§IV and VI, and ¶¶199, 205, 208, 216, 218, 229, 245. In particular, Valeant's network of captive pharmacies was not developed to "deliver better, faster customer service for doctors and patients," or transfer risks of non-payment, but was part of Valeant's strategy to implement deceptive sales practices unlikely to be covered by insurance or approved by PBMs, and only heightened the risk to the Company of increased scrutiny from government regulators, as well as to alienate PBMs, private payors, and physicians.

249.   On December 16, 2015, Valeant issued a press release formally withdrawing the inflated guidance it issued less than two months earlier on October 19, 2015. Attempting to offset the disappointing revised 2015 guidance and notwithstanding the financial impact of its lost sales through Philidor and increased scrutiny by PBMs and private payors, Valeant's December 16, 2015 press release projected robust 2016 growth with revenue of $12.5 - $12.7 billion, cash EPS of $13.25 - $13.75, and EBITDA of $6.9 - $7.1 billion.

250.   The same day, Valeant hosted a conference call. Pearson, Rosiello and Kellen participated on behalf of the Company. Rosiello repeated the 2016 guidance and Pearson stated the guidance was conservative, noting: "*I feel very comfortable with the guidance*. But each little pieces [sic], I feel little less comfortable this year just given - *so we put an extra dose of conservatism in*." Pearson added: "*Addyi* . . . a lot of people have said, Addyi is a disaster; *today you'll see it's not a disaster*. *So we believe we'll sell between $100 million and $150 million in sales of Addyi next year*."

251.   Plaintiff read and relied upon the statements in ¶¶249-250 prior to writing Valeant puts and purchasing Valeant shares. The statements referenced above in Valeant's

December 16, 2015 press release and conference call were false and misleading when made

for the reasons set forth in §§IV and VI, and ¶¶199, 205, 208, 216, 218, 229, 245, 248. In

particular, at the time of issuing increased guidance, Defendants were aware that they had

doubled the price of Addyi, making it unlikely to be covered by insurance or approved by

PBMs, cancelled a distribution agreement with Cardinal Health in order to rely on Philidor

to distribute Addyi, and the disclosure of Valeant's relationship with Philidor and

investigations into their price gouging would result in decreased sales, sale prices, revenue,

and earnings. In addition, Defendants' statements were false and misleading because

Defendants had no reasonable basis to believe and, in fact did not believe, that Valeant

could achieve 2016 growth with revenue of $12.5-$12.7 billion, cash EPS of $13.25-

$13.75, and EBITDA of $6.9-$7.1 billion.

## VII.  VALEANT'S FINANCIAL STATEMENTS VIOLATED GAAP AND SEC RULES

252.    As discussed above, throughout the relevant period, Valeant's periodic

financial statements with the SEC represented that Valeant's financials were prepared in

accordance with GAAP. Financial statements filed with the SEC are presumed to be

misleading and inaccurate if they have not been prepared in conformity with GAAP. *See*

Regulation S-X, 17 C.F.R. § 210.4- 01(a)(1). This presumption also exists for interim

financial statements filed with the SEC. *See* 17 C.F.R. §210.10-01.

253.    Valeant has admitted that its reported revenues for the financial periods

below during the relevant period were overstated. For the 12 months ended December 31,

2014, reported revenue was overstated by $57.5 million; for the three months ended March

31, 2015, reported revenue was overstated by $20.8 million; for the six months ended June

30, 2015, reported revenue was overstated by $20.8 million; and for the nine months ended September 30, 2015, reported revenue was overstated by $20.8 million.

254.    Valeant's financial statements during the relevant period were materially misstated and violated GAAP (and certain of the Company's critical accounting policies), (i) by improperly recognizing Philidor revenue, in violation of GAAP; (ii) by concealing Philidor as a VIE, in violation of GAAP as well as Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 810, *Consolidation*; (iii) by falsely certifying that the Company's internal controls over financial reporting and its disclosure controls were effective, in violation of SOX and SEC rules, as well as the Committee of Sponsoring Organizations, Internal Control – Integrated Framework; (iv) by concealing information regarding the impact of Philidor and pricing on its reported revenue and earnings, in violation of SEC disclosure rules; and (v) because Defendants' false and misleading statements were quantitatively and qualitatively material, including pursuant to SEC Codification of Staff Accounting Bulletins Topic 1-M, *Materiality*.

255.    On March 21, 2016, Valeant confirmed that it had materially overstated Philidor revenue in violation of GAAP and would be restating its financial statements for FY14 and the first nine months of FY15, and that, as a result, the Company's 2014 Form 10-K and Form 10-Qs for the first, second, and third quarters of 2015 could no longer be relied upon. Valeant concluded that, prior to the Company's purchase option agreement with Philidor in 4Q14, certain sales transactions involving Philidor were not executed in the normal course of business and collectability was not reasonably assured at the time the revenue was recognized. *See* FASB Accounting Standards Codification Topic 605, Revenue Recognition; SEC Staff Accounting Bulletin No. 104 ("SAB 104").

- 89 -

256.   As detailed above, Valeant entered into a purchase option agreement with Philidor on December 15, 2014. Before the option agreement, Valeant recognized revenue on sales to Philidor when Valeant delivered products to Philidor, *i.e.*, on a sell-in basis. After the option agreement, Valeant was required to recognize revenue when Philidor distributed the products to the end customers (patients), *i.e.*, on a sell-through basis.

257.   In 4Q14, leading up to the option agreement's execution, Valeant improperly recognized revenue on sales transactions with Philidor that were not executed in Valeant's normal course of business, but rather to inflate revenues. As admitted in Valeant's 2015 10-K, these purported sales transactions included: "fulfillment of unusually large orders with extended payment terms and increased pricing, an emphasis on delivering product prior to the execution of the purchase option agreement and seeking and filling a substitute order of equivalent value for an unavailable product." As a result of these improper sales transactions, Valeant recorded revenue. After recording revenue on those fictitious sales, and after execution of the option agreement, Valeant recognized revenue a second time as Philidor sold the same products to end customers.

258.   With regards to the 4Q14 Philidor transactions, collectability was not reasonably assured at the time the revenue was originally recognized, and thus should not have been recognized. Valeant acknowledged in its March 21, 2016 press release that, as a result, the Company's financial statements for the year ended December 31, 2014 were materially misleading and required restatement.

259.   Valeant also failed to disclose Philidor as a variable interest entity. Pursuant to ASB Accounting Standards Codification Topic 810, Consolidation ("ASC 810"), a company must disclose in its financial statements both unconsolidated and consolidated

VIEs. In its October 26, 2015 investor presentation, Valeant admitted that it considered Philidor a VIE prior to the purchase agreement.

260.    On October 26, 2015, Valeant claimed that it was not the primary beneficiary of Philidor until after the purchase option agreement was executed in December 2014. Following the execution of the purchase option agreement (in which Valeant concluded it was the primary beneficiary of the Philidor VIE and consolidated Philidor's results), Valeant was required under ASC 810 to disclose which factors resulted in a change of the reporting with respect to the VIE, including the impact of the change on the Company's consolidated financial statements. *See* ASC 810-10-50-5A. Valeant failed to disclose this information in its 2014 10-K. Valeant also failed to make additional VIE disclosures necessary to comply with the principal disclosure objective of ASC 810, *i.e.*, to provide users of its financial statements with information concerning (i) significant judgments and assumptions made in determining whether it needs to consolidate the VIE and/or disclose information about its involvement with the VIE; (ii) the nature of and changes in the risks associated with its involvement with the VIE; and (iii) how its involvement with the VIE affects its financial position, financial performance, and cash flows. *See* ASC 810-10-50-8. However, Valeant did not make any required disclosures related to its VIE relationship with Philidor until the Company's 3Q15 10-Q.

261.    Valeant also failed to disclose the Philidor relationship and its impact on the Company's revenues, and Valeant's dependency on price increases, in the Management's Discussion and Analysis ("MD&A") section of each quarterly and annual report filed during the relevant period nor did Valeant disclose the risks associated with the extent of its reliance on Philidor and the concealed pharmacy network.

262.    With regard to Philidor, Valeant was required to disclose, among other things, (i) Philidor's impact on Valeant's revenue growth; (ii) Philidor's existence as a distinct sales channel; and (iii) that Philidor sales were unsustainable. During the relevant period, Valeant repeatedly emphasized U.S. organic sales growth and sales growth in its dermatology segment, as well as the role of volume increases, as opposed to price increases, on its revenue growth.

263.    As detailed above, the Valeant pharmacy network and price increases were major drivers of the Company's purported revenue and profitability growth trends during the relevant period, including U.S. organic sales growth, dermatology and neurology sales growth, and overall prescription volume growth. As a result, Valeant was required to disclose the impact of Philidor and price increases on its revenue growth trends. *See* SAB 104. However, Valeant failed to disclose Philidor in its MD&A until 3Q15.

264.    Valeant was also required to disclose the trend of increasing sales through Philidor because Philidor was a separate sales channel with different characteristics than Valeant's traditional sales channels. The SEC Staff provides specific examples of required MD&A disclosures regarding sales channels, including "[c]hanging trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns." *See* SAB 104, Topic 13.B. During the relevant period, Valeant disclosed "Provisions to reduce gross product sales to net product sales" in its financial statements. The sales provisions as a percentage of gross sales increased dramatically throughout the relevant period, including increases of 47%, 7%, and 28% in 2013, 2014, and 3Q15, respectively. However, Defendants concealed the

fact that these significant increases in provisions were tied to deceptive practices, such as routing patients into Valeant's secret pharmacy network and the improper use of PAPs.

265.    Philidor also employed practices to deceive TPPs. As a result, Valeant's sales, through its concealed relationship with Philidor, were unsustainable. When private insurers and PBMs became more aware of Philidor and its practices in late 2015, they immediately stopped reimbursing Philidor. Consequently, Valeant closed Philidor. The significant financial impact that the Philidor closing ultimately had on Valeant's future financial results, including its revenues and earnings, is precisely the type required to be disclosed by Valeant under the SEC's MD&A rules.

266.    Valeant management was responsible for establishing and maintaining effective internal controls over financial reporting and disclosure controls pursuant to the Sarbanes-Oxley Act of 2002. This requirement included annual assessments of Valeant's financial and disclosure controls and the issuance of a report on whether such controls were effective and free from material weaknesses. SOX required the use of an appropriate framework in making such assessments, such as the "COSO Framework." *See* Committee of Sponsoring Organizations, Internal Control – Integrated Framework. During the relevant period, Valeant's financial statements represented that management's evaluations were based on the COSO Framework.

267.    According to the COSO Framework, the control environment sets the tone for the entire structure of internal control and has a pervasive influence on all business activity. As a result, deficiencies affecting the control environment are strong indicators of a material weakness. Circumstances that may indicate that a company's control environment is ineffective include, but are not limited to, "[i]dentification of fraud of any

magnitude on the part of senior management" and "[i]neffective oversight of the company's external financial reporting and [internal controls over financial reporting] by the company's audit committee." *See* Exchange Act Release No. 54976 (Dec. 20, 2006). The concept of "tone at the top" has become widely accepted within the accounting profession to describe the attitude and actions of a company's senior management toward internal financial controls and the control environment. Indeed, SEC Staff has referred to the tone set by top management – *i.e.*, "the corporate environment or culture within which financial reporting occurs" – as "the most important factor contributing to the integrity of the financial reporting process." *See* SEC Staff Accounting Bulletin No. 99.

268.    Control deficiencies that are determined to be a material weakness must be disclosed in management's annual report on its assessment of the effectiveness of the company's internal controls over financial reporting. Management may not disclose that it has assessed its internal financial controls as effective if there is one or more control deficiencies determined to be a material weakness. *See* Exchange Act Release No. 54976. Indicators of material weaknesses in a company's internal controls over financial reporting include: (i) identification of fraud, whether or not material, on the part of senior management; (ii) restatement of previously issued financial statements to reflect the correction of a material misstatement; (iii) identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and (iv) ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee. *See* Public Company Accounting Oversight Board Auditing Standard No. 5.

269.     As detailed above, Defendants repeatedly represented during the relevant period that Valeant's internal controls functioned properly to prevent or detect material misstatements. This included SOX Certifications contained in each of the Company's quarterly and annual reports. However, in connection with the restatement, Valeant has admitted that material weaknesses in its internal financial controls existed during the relevant period, and that its disclosure controls and procedures were not effective.

## VIII.   RELIANCE

270.     The false and misleading statements set forth herein were widely disseminated to the securities markets, investment analysts and to the investing public, including Plaintiff and its investment manager. Those statements caused and maintained the artificial inflation of the price of Valeant common stock, which consequently traded at prices in excess of its true value, and also impacted the price of Valeant puts.

271.     Plaintiff and its investment manager Okumus Fund Management, Ltd., through its employees, read, or listened to, and relied on Defendants' materially false and misleading statements alleged herein prior to purchasing Valeant shares and/or writing Valeant puts. Plaintiff and its investment manager specifically heard or read and relied upon Defendants' false and misleading statements pertaining to, among other things, the Company's disclosures concerning its internal controls, financial guidance and reporting and sales of pharmaceuticals through the purportedly independent specialty pharmacies, such as Philidor, as identified in §VI. Plaintiff read and relied upon the specific statements in Valeant's SEC filings alleged herein in §VI, and in particular Plaintiff was keenly interested in disclosures concerning (i) risks to the Company's business from increasing prices; (ii) risks to the Company's business due to relations with insurance companies,

PBMs and TPPs; (iii) related third-party transactions; (iv) anything concerning the Company's specialty pharmaceutical sales network and payment practices; and (v) underlying drivers of revenue growth and profitability at the Company.

272.   Plaintiff and its investment manager are professional investors, who routinely engage in thorough research before purchasing any security and continue to monitor all of their investments through extensive research. This research includes a review of relevant media, research analyst reports, SEC filings, press releases, conference calls, and any other information source likely to provide important information on the business. Plaintiff's investment in Valeant was no different.

273.   Prior to purchasing shares of Valeant common stock and/or writing Valeant puts, Plaintiff and Okumus Fund Management, Ltd. took specific actions to ensure that in performing their duties as an investment manager Okumus never transacted in any security without first reading SEC filings and analyst reports related to the issuer and/or the specific security. Indeed, Okumus Fund Management, Ltd. has a pattern and practice of always reading and reviewing available SEC filings and analyst reports prior to making investments (and continuing to monitor these reports). As part of their job functions, employees of Okumus Fund Management, Ltd. had the responsibility to read and review available SEC filings and analyst reports. Okumus Fund Management, Ltd.'s specific actions to ensure it read and reviewed available SEC filings and analyst reports prior to making an investment decision applied with equal force to its decision to invest in Valeant, and Okumus Fund Management, Ltd. (as well as Plaintiff) did in fact read and review available SEC filings and analyst reports, and listened to investor conference calls, as identified in §VI.

274.     In particular, and by way of an example, prior to making the decision to purchase Valeant securities, Okumus Fund Management, Ltd. (as well as Plaintiff) actually read, reviewed and relied upon Valeant's 2014 10-K, including Defendants' statements that: (a) claimed "[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care. . . ."; and (b) stated that "[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary," while omitting any mention of Philidor.

275.     In particular, and by way of an example, Okumus Fund Management, Ltd. (as well as Plaintiff) recalls listening to and reviewing the October 26, 2015 investor call and presentation during which Valeant management provided financial guidance; reiterated that Philidor was "independent" from Valeant; and indicated that "Philidor was not considered to be material to Valeant's business for reporting purposes." And, Okumus Fund Management, Ltd. (as well as Plaintiff) recalls during this same October 26 call Valeant management stated that the "[t]he audit committee of the Board and the full Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment."

276.     Okumus Fund Management, Ltd. and Plaintiff reasonably and justifiably relied on Defendants' false and misleading statements in deciding to write Valeant puts and/or purchase Valeant shares in and after October 2015. Okumus Fund Management, Ltd. and Plaintiff were ignorant of the truth concerning Defendants' wrongful conduct, as

detailed in §IV, and believed the false and misleading statements detailed in §VI, which Okumus relied upon, to be complete and truthful.

277.    Had Okumus Fund Management, Ltd. or Plaintiff read or listened to a truthful account of Valeant's relationships with, and reliance on, specialty pharmacies, including Philidor, to increase the prices of Valeant products and boost the volume of Valeant's sales, as well as its lack of internal controls over financial reporting and general business activities alleged herein, Okumus Fund Management, Ltd. and Plaintiff would not have decided to purchase Valeant shares. Disclosure of the true financial condition of Valeant, as alleged herein, would have indicated to Okumus Fund Management, Ltd. and Plaintiff that any investment in Valeant posed an exceedingly high risk of being rendered worthless without adequate compensation for this heightened risk.

278.    Plaintiff is also entitled to the presumption of reliance established by the fraud-on-the-market doctrine. At all relevant times, the market for Valeant's publicly-traded common stock and put options was efficient for the following reasons, among others:

a.    Valeant common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Valeant filed regular reports with the SEC;

c.    Valeant regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.      Valeant was regularly followed by numerous securities analysts employed by major brokerage firms headquartered in the United States and overseas who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.  Many of these reports were publicly available and entered the public marketplace;

e.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Valeant's securities; and

f.      Without knowledge of the misrepresented or omitted facts, Plaintiff wrote Valeant put options and purchased or otherwise acquired Valeant common stock between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Valeant common stock was artificially inflated by the Defendants' misrepresentations and omissions.

279.    As a result of the foregoing, the market for Valeant common stock and Valeant put options promptly reacted to current information regarding Valeant from publicly available sources and reflected such information in the trading price of Valeant common stock and put options. Under these circumstances, a presumption of reliance applies pursuant to the fraud-on-the-market doctrine.

280.    Plaintiff is also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market, including the Company's use and control of Philidor, the impact those practices would have on its business and portfolio of branded pharmaceuticals, as well as other facts concerning Valeant's business.

281.    The price of Valeant securities, including the Valeant put options sold by Plaintiff and the common shares purchased by Plaintiff, were artificially impacted by the material misstatements and omissions alleged herein, including the false and misleading statements regarding Valeant's specialty pharmacy sales practices, effectiveness of its internal controls, and the material negative impact the subsequent loss of business had on the Company. *See* §IV.E.

282.    These undisclosed material risks and others – which were the foreseeable result of Defendants' fraudulent scheme to inflate the price of Valeant shares through misleading and deceptive practices – materialized and caused the market value of Valeant common stock to decline to the detriment of Plaintiff.

283.    As alleged, a series of partial disclosures emerged over time and revealed Defendants' fraudulent scheme and its implications for Valeant. The disclosures partially revealed the nature and extent of Valeant's covert captured pharmacy network. *See* §IV.E.

284.    Although these disclosures partially revealed certain internal control weaknesses and flaws in Valeant's business model and financial reporting, Defendants continued to mislead investors, including Plaintiff, because Defendants had not yet fully revealed the extent of the Philidor network or the impact that the improper business practices (and the cessation thereof) would have on Valeant's business relationships and continued ability to make sales and achieve earnings. This is evidenced by the fact that as late as March 15, 2016, Defendants were still revising downward the projections for earnings while taking tens of millions dollars in write downs associated with the closing of Philidor.

285.     As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct alleged herein, Plaintiff wrote puts and purchased Valeant common stock at prices not reflecting the securities' true worth. Valeant shareholders, including Plaintiff, were injured when the scheme was revealed and Valeant closed Philidor, restated its financial results in March 2016, and Valeant's business was negatively impacted going forward.

286.     The partial disclosures reduced the amount of inflation in the price of Valeant's stock when they were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized. Plaintiff was damaged as a result.

## IX.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

287.     The statutory safe harbor which provides safe harbor for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading concerned statements of existing or historical fact or conditions. To the extent that any of the statements alleged to be false and misleading may be deemed to be forward-looking statements, Defendants are nevertheless liable for those statements because they were not identified as forward-looking statements. Even if the statements were identified as forward-looking, the statements were material and were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements and, at the time each of those statements was made, Defendants had actual knowledge that the particular forward-looking statement was false or the forward-looking statement was authorized and/or approved by an officer of Valeant who knew that the statement was false when made. Further, to the

extent that any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements that later became inaccurate and/or did not disclose information that undermined the validity of those statements.

## X.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Against All Defendants for Violations of
#### §10(b) of the Exchange Act and SEC Rule 10b-5

288.    Plaintiff incorporates by reference ¶¶1-287, as if fully set forth herein.

289.    Defendants along with other Valeant employees, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Valeant, as specified herein.

290.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit in an effort to maintain an artificially high market price for Valeant common stock (and which also negatively impacted the price for Valeant put options) in violation of §10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

291.    Defendants: (i) deceived the investing public, including Plaintiff, as alleged herein; (ii) artificially inflated and maintained the market price of Valeant's common stock and thereby impacted the price for Valeant puts; and (iii) caused Plaintiff to purchase

Valeant shares at artificially inflated prices and write Valeant puts at prices not reflecting their true value.

292.    The Individual Defendants' primary liability, and controlling person liability, arise from the following facts: (i) each was a high-level executive and/or director at the Company; (ii) each, by virtue of his or her responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and (iv) each was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with severe recklessness was materially false and/or misleading.

293.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Valeant's publicly disseminated information.  The Individual Defendants were provided with copies of the Company's reports, press releases and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

294.    Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged herein, or acted with reckless disregard for the truth by failing to ascertain and disclose such facts, even though such facts were available. Defendants'

- 103 -

material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Valeant's adverse operating and financial condition, including its inadequate internal controls, sales practices, and the details of its activities involving Philidor and its related specialty pharmacy network, from the investing public and supporting the artificially inflated price of its securities. As alleged herein, Defendants had actual knowledge of the misrepresentations and omissions alleged, or were reckless in failing to obtain such knowledge by deliberately refraining from discovering whether their statements were false and/or misleading.

295. As a result of the fraudulent activities of Defendants described above, the market price of Valeant common stock was artificially inflated and the resulting price for Valeant puts was correspondingly impacted. In ignorance of the fact that the market price of Valeant common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which Valeant common stock traded at the time when such statements were made, Plaintiff acquired Valeant common, and wrote puts, at artificially impacted prices and were damaged thereby, as evidenced by, among other factors, the stock price declines identified herein that released the artificial inflation from Valeant common stock. At the time of the alleged misrepresentations and omissions, Plaintiff was unaware of their falsity, and believed the false statements to be true. Had Plaintiff known the true nature of the operations of Valeant and the Company's failure to disclose it true relationship with Philidor, Plaintiff would not have wrote puts or acquired Valeant common stock.

296.    Plaintiff can also establish actual reliance. Plaintiff and its investment manager actually read (and/or listened to) and relied upon Defendants' false and misleading statements as set forth herein, and as detailed in §VIII.

297.    Plaintiff is entitled to the presumption of reliance established by the fraud-on-the-market doctrine for publicly traded Valeant common stock and options. At all times relevant to this Complaint, the market for Valeant common stock and Valeant puts was an efficient market. Valeant common stock was listed and actively traded on a highly efficient and automated market; Valeant filed periodic public reports with the SEC; Valeant was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about the Company; and, Valeant regularly issued press releases, which were carried by national and international news wires, and which were publicly available and entered into the public marketplace. As a result, the market for Valeant equity securities promptly digested current information regarding Valeant from all publicly available sources and reflected such information in Valeant's stock price.

298.    Plaintiff is also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market concerning Defendants' specialty pharmacy network and sales practices, as well as internal controls over financial reporting.

299.    The market prices for Valeant common stock declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein. The prices of Valeant puts written by Plaintiff similarly were impacted.

300.   As a direct and proximate result of the alleged wrongful conduct, Plaintiff suffered damages in connection with its purchase of Valeant common stock and sale of Valeant put options.

301.   By virtue of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## SECOND CAUSE OF ACTION

### Against Valeant, Pearson, Schiller and Rosiello for Violations of §18 of the Securities Exchange Act of 1934

302.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except allegations that the Individual Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this claim, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

303.   This claim is asserted against Valeant, Pearson, Schiller and Rosiello for violations of §18 of the Exchange Act.

304.   As set forth above, Defendants made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Valeant, including the Company's filings on Forms 10-K and 10-Q during the relevant period. Specifically, Plaintiff read and relied on the Company's financial statements, the Company's disclosures concerning its internal controls, financial reporting and statements regarding its sales of pharmaceuticals through specialty pharmacies, as identified in §VI.

305.    Plaintiff and its investment manager read and relied upon statements in the Company's SEC filings concerning Valeant's financial statements being materially complete and not omitting material information. Plaintiff read and relied upon disclosures that Defendants purportedly implemented appropriate internal controls over accounting and utilized independent committees to oversee business governance and compensation. Plaintiff read and relied upon Defendants' signed SOX Certifications. Plaintiff and/or its agents relied on these SEC filings not knowing that they were false and/or misleading.

306.    The reliance by Plaintiff and/or its agents was reasonable.

307.    When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiff was significantly damaged by the resulting drop in the value of Valeant common stock (which similarly impacted Plaintiff through it sales of Valeant puts).

308.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of Valeant common stock and sale of Valeant puts.

309.    By virtue of the foregoing, Valeant, Pearson, Schiller, and Rosiello violated §18 of the Exchange Act.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants for Violations of
### §20(a) of the Exchange Act

310.    Plaintiff incorporates by reference ¶¶1-301, as if fully set forth herein.

311.    During the relevant period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Valeant's business affairs. Because of the Individual

Defendants' senior positions, they knew the adverse non-public information about Valeant's inadequate internal controls, reliance on price increases for growth, use of the covert Philidor network, and improper sales practices.

312.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Valeant's financial condition and results of operations, and to correct promptly any public statements issued by Valeant which had become materially false or misleading.

313.    Because of the Individual Defendants' positions of control and authority as senior officers of Valeant, they were able to, and did, control the contents of the various reports, press releases and public filings which Valeant disseminated in the marketplace during the relevant period. Throughout the relevant period, the Individual Defendants exercised power and authority to cause Valeant to engage in the wrongful acts complained herein. The Individual Defendants, therefore, were each a "controlling person" of Valeant within the meaning of §20(a) of the Exchange Act. In this capacity, the Individual Defendants participated in the unlawful conduct alleged which artificially inflated the market price of Valeant common stock.

314.    By reason of the above conduct, the Individual Defendants are each jointly and severally liable pursuant to §20(a) of the Exchange Act for Valeant's primary violations of the Exchange Act as alleged herein.

**FOURTH CAUSE OF ACTION**

**Against All Defendants for Common Law Fraud**

315.    Plaintiff incorporates by reference ¶¶1-287, as if fully set forth herein.  This claim is asserted against all Defendants based on common law principles of fraud and conspiracy.

316.    As alleged herein, each of the Defendants made material misrepresentations and omitted to disclose material facts about Valeant, its business practices and its financial condition.

317.    In addition, Defendants conspired with each other for the purpose of misleading Plaintiff and the investing public regarding Valeant's business, and each committed overt acts, including making false and misleading statements, in furtherance of the conspiracy.

318.    The aforesaid misrepresentations and omissions by Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiff and the investing public when making investment decisions.

319.    The aforesaid misrepresentations and omissions by the Defendants constitute fraud and deceit under common law.

320.    Plaintiff reasonably relied upon Defendants' misrepresentations when deciding to write puts and purchase Valeant common shares, and did not know of any of the misrepresentations and omissions, as alleged with further detail herein.

321.    As a direct and proximate result of Defendants' fraud and deceit, Plaintiff suffered damages in connection with its sale of puts and purchase of Valeant common stock.

322.    Defendants' fraud and deceit was intentional and/or involved conscious acts that willfully and wantonly disregarded the rights of others, including not only Plaintiff, but also the investing public. As a result, Defendants should be required to pay punitive damages to Plaintiff.

## FIFTH CAUSE OF ACTION

### Against All Defendants for
### Negligent Misrepresentation

323.    Plaintiff incorporates by reference ¶¶1-287, as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this claim, Plaintiff asserts only negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

324.    Defendants made and/or caused to be made material false and/or misleading statements to shareholders, including Plaintiff, concerning, among other things, Valeant's internal controls and business practices, as alleged herein.

325.    Defendants knew, or should have known, that their statements to shareholders, including Plaintiff, were false and/or misleading and/or Defendants made the false statements without knowledge of their truth or falsity. When making their statements, Defendants possessed, and knew of, material non-public adverse information regarding

Valeant, which Plaintiff did not possess and could not replicate when making its investment decisions.

326.    Defendants' false and/or misleading statements to shareholders, including Plaintiff, concerning Valeant's pharmaceutical sales and use of specialty pharmacies, were made for a serious purpose, and Defendants intended to induce shareholders, including Plaintiff, to rely upon Defendants' false statements when making investment decisions to sell puts and purchase Valeant common stock.

327.    Plaintiff justifiably relied upon Defendants' false and misleading statements to Plaintiff's detriment. Plaintiff wrote puts and purchased Valeant common stock at times when Valeant common stock traded artificially inflated prices and the market prices for Valeant common stock declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein. The market prices for Valeant common stock declined materially when the foreseeable risks concealed by Defendants' misleading statements materialized. As a direct and proximate result of the alleged wrongful conduct, Plaintiff suffered damages in connection with its sale of Valeant puts and purchase of Valeant common stock.

328.    Plaintiff's reliance was justifiable in that Plaintiff conducted an ongoing, reasonable and thorough investigation of Valeant prior to writing puts and purchasing Valeant common stock. This investigation included, among other things, reviewing and reading relevant SEC filings, conference calls, media and analyst reports. This investigation did not reveal the truth to Plaintiff.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Requiring Defendants to pay damages sustained by Plaintiff by reason of the acts and transactions alleged herein.

B.     Requiring Defendants to pay punitive damages for their violations of common law fraud and by reason of the acts and transactions alleged herein.

C.     Awarding Plaintiff prejudgment interest and post-judgment interest as allowed pursuant to statutory and common law, as well as its reasonable attorneys' fees, expert fees and other costs.

D.     Awarding such other and further relief as the Court may deem just and proper.

## XII.   JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all triable claims.

DATED:  August 29, 2017          Respectfully submitted,

STONE BONNER & ROCCO LLP

/s/ Patrick L. Rocco
Patrick L. Rocco
James P. Bonner
447 Springfield Avenue, Second Floor
Summit, New Jersey
Telephone: (908) 516-2045
Facsimile: (908) 516-2049
procco@lawsbr.com

STONE BONNER & ROCCO LLP
Ralph M. Stone
1700 Broadway – 41st Fl.
New York, NY  10019-4613
Telephone: (212) 239-4340

DIETRICH SIBEN THORPE LLP
MATTHEW P. SIBEN (*pro hac vice pending*)
500 Australian Avenue South, Suite 637
West Palm Beach, FL 33401
Telephone: (561) 820-4882
Facsimile: (561) 820-4883
matthew@dstlegal.com

– and –

DAVID A. THORPE (*pro hac vice pending*)
SHAWN M. HAYS (*pro hac vice pending*)
9595 Wilshire Blvd., Suite 900
Beverly Hills, CA 90212
Telephone: (310) 300-8450
Facsimile: (310) 300-8401
david@dstlegal.com
shawn@dstlegal.com

*Attorneys for Okumus Opportunistic Value Fund, Ltd.*